CITY OF McRAE *et al. v.* FOLSOM *et al.*

No. 13305. NOVEMBER 30, 1940.

*S. A. Nunn* and *George H. Harris,* for plaintiffs in error.
*W. S. Mann,* contra.

ATKINSON, Presiding Justice.   Folsom and a number of others filed an action against the City of McRae and named officials, seeking an injunction against enforcement of certain street-improvement assessments.  As to some of the petitioners it was alleged that executions had been issued, levies made, and that the lands were being advertised for sale; as to others it was stated that while the assessments had been made, no executions had as yet been issued, but that the city was threatening to issue them and would so do unless prevented by order of the court.  It was further alleged, that under the charter of the City of McRae, before the mayor and council could acquire jurisdiction to pave any of the streets or sidewalks, the abutting-property owners should have the privilege and option of doing the work in front of their respective properties at their own expense; that before acquiring jurisdiction to do the paving itself the city is required to specify the material to be used and to direct the grade, and then to give notice to the abutting owners with demand that the latter do the work within a reasonable time, and that only on failure of the owners to perform could the city make the improvements; that the city never at any time gave the owners the required notice, with specifications, etc., and never gave them the privilege and opportuntiy to do the work, but itself proceeded to contract for and perform it, contrary to the charter and the laws of the city, and that as a consequence the assessments, the executions, and the levies were illegal and void; that no ordinance had been enacted in pursuance of the 1925 amendment to the

charter, providing for the paving or improvement of any of the streets or sidewalks, directing the style thereof and the material to be used, and providing for notice or demand on the abutting-property owners to do the work, and giving them the option to do it, and that.without such an ordinance the city could not itself acquire jurisdiction to do it and assess the cost against petitioners; that practically all of the assessments involved were for sidewalk improvements; that the assessments were made on or about November 1, 1926; that at that time there was an ordinance of force which provided that on completion of the work a bill therefor should be presented to the property owner, and if it was not paid within ten days an execution should be issued for the amount of the bill and delivered to the marshal who was required to collect it by levy and sale of the property involved; that more than eight years elapsed between the time the work was completed and the cost ascertained and prorated and the time the executions had issued; and that the assessments having become due and payable immediately, and the ordinance providing for the immediate issuance of executions, the failure to issue them for more than eight years resulted in their becoming barred by the statute of limitations; that the assessments and the work done in pursuance thereof were of no benefit to the property; that as to most of the properties involved the amounts of the assessments were greater than the values of the lands, and that as a whole and as an average the assessments equaled at least three fourths of the total value, and therefore they amounted to a confiscation of the property; that in order to avoid litigation and to perform equity the petitioners had paid approximately one third of the alleged cost of the paving, and this amount is greatly in excess of the amount that could in reason be claimed to have been of benefit to petitioners or their property; that the improvements had been made of inferior material; and that the paving soon began to break and crumble, and has continued to deteriorate, and in a short time will have to be relaid. It was stated that if, on the trial of the case, it should be adjudged that petitioners had not done equity (in the payments made) and that the property had been benefited, they were willing to pay whatever it should be determined by decree that they should pay; and that although they averred that they owed nothing, they were ready and willing to perform equity.

An exhibit attached to the petition showed that the executions

had been issued in May, 1934, and that the advertisement was proceeding for sales on the first Tuesday in September, 1934. The petition was filed on August 31, 1934; a temporary restraining order issued, but no interlocutory hearing was had on the application for injunction. In July, 1938, an amendment was filed, striking the names of all of the petitioners except Mrs. I. J. Davis, Mrs. Vashti Rose, Mrs. Stuart Evans, L. L. Folsom, M. B. Folsom, Miss Martha Folsom, Mrs. W. B. Folsom, Mrs. H. L. Mansfield, Mrs. Callie McDuffie, and Harvey Graham. It was stated that all of the other original parties plaintiff had settled with the city, and were now no longer proper parties. As to Mrs. Davis it was alleged, that the assessment for sidewalk paving was for $143.81; that at the time of the paving the property had a market value of $2000; that the improvements did not enhance the value; and that she has paid nothing on the assessment. As to Mrs. Rose it was alleged, that the total of the assessments was $306.40, on which she had paid nothing; that the value of the property did not exceed $1500; that the work as done diverted surface-water drainage onto her lot, washed away the sidewalk so constructed, and materially damaged the lot and dwelling; that she protested to the authorities and to the contractors as to the doing of the work and objected thereto, pointing out that the paving would result in damage to her property; and that the work done depreciated the value of her place in an amount greatly in excess of the assessment. As to the lot owned by Mrs. Evans, the Folsoms, and Mrs. Mansfield it was alleged, that the total assessment was $640.86, on which $192.24 had been paid; that the amount so paid far exceeds any enhancement in value by reason of the paving; that the lot is vacant, and at no time since the paving has it had a market value of over $500; and that the amount assessed exceeded the entire market value. Complete confiscation was claimed. As to Mrs. McDuffie it was alleged, that the assessment on one of her lots was $321.43, on which she has paid $96.45; that the lot was worth not more than $100; that it is located in what was a branch or swamp, and the assessment has made is unsalable and of no market value whatever; that her other lot was assessed a total of $404.11, on which she has paid $121.23, which greatly exceeds any enhancement in value; and that at the time of the assessments the property was of a value of not more than $300, which was less than

the amount of the assessments. As to Harvey Graham it was alleged, as to one lot, that it had never been legally assessed for any paving improvement whatever, but despite that fact the city had issued executions against it and is seeking to collect an assessment of $911.70. Reasons were stated why it was claimed that the purported assessment was void. Also, that in addition to said execution, which was for Oak Street paving, the land had been assessed for paving on Second Avenue against E. D. Graham estate in the sum of $960.32, and for sidewalk paving $121.98, and for sidewalk on Oak Street $204.47; that the sidewalk paving and street paving exceeded the total value of the property; that he had paid $1992.74 on this and other stated assessments, which amount greatly exceeds any possible benefit to the property. As to another lot it was alleged, that there were assessments of $200.30, $77.60, and $82.06, on which Harvey Graham had paid $91.16, which far exceeds any benefits to the property; that as to another lot the total assessments amounted to $566.54, which far exceeded the total value of the property, and Harvey Graham had paid $224.64 on the assessments, which far exceeded the total value of any benefits received; that as to another lot the assessment was $103.46, on which Harvey Graham had paid $26.24, which exceeded any possible benefits received, and that the improvements did not enhance the value of the property.

The defendants filed a demurrer on the following grounds: (1) The petition sets out no cause of action. (2) There is no equity in the petition. (3) Each of the plaintiffs has an adequate remedy at law by illegality under section 6 of the act approved July. 21, 1925, amending the charter of the City of McRae. (4) There is a misjoinder of parties plaintiff. (5) The petition shows that plaintiffs have been guilty of such laches as to deprive them of any right to equitable relief, if they were otherwise entitled to it. It is not shown that they objected to the steps taken by the city as prerequisites to the improvements, or objected to the improvements. (6) The petition fails to show any interest in common between the parties plaintiff or in the subject-matter involved. The defendants filed also an answer, the details of which it is unnecessary, for the purposes of this decision, to state. The demurrer was overruled. Exceptions pendente lite were filed, and error is assigned on them. In connection with the main case was a collateral issue

presented by a petition of the same plaintiffs, seeking to establish part of an alleged lost resolution or ordinance purporting to adopt for the City of McRae a code of city laws or ordinances. From the allegations it appeared that the sections of ordinances which the plaintiffs desired to use in evidence in the case were in existence, but the original enacting clause had been lost, and this they sought to establish. It was agreed that this motion to establish the copy in lieu of the alleged lost original should be heard with the main case, and that in the event the copy was established it might be considered as in evidence.

The case was tried, by consent, before the judge without a jury, for decision on all questions of law and fact. Much evidence was introduced. A final decree, rendered on January 17, 1940, referred to the previous judgment overruling the demurrer, and stated that that judgment became the law of the case. It was adjudged, that the copy of the portion of the ordinance alleged to have been lost was correct, and that it be established and have all the force and effect of the original; that the plaintiffs who remained in the case after the amendment filed in July, 1938, had sustained the allegations of fact in the petition and amendments as alleged, by a preponderance of the evidence; that the assessments against the property of the plaintiffs were null and void, and were vacated; that the defendants be permanently enjoined from seizing, levying upon, or selling any part of the property of the plaintiffs. The defendants excepted.

The case presents the following questions: (1) Did the City of McRae, under its charter as amended, have the right itself to do the work here involved, without first giving the abutting property owners notice with the option to do the work themselves? (2) If so, were the enabling ordinances which were passed sufficient to set this power in motion? (3) If so, did the statute of limitations operate against the city, because of the time which elapsed between the fixing of the assessments and the issuance of executions thereon? (4) If not, were the complainants in laches at the time they filed their bill to enjoin the further progress of the executions, and to obtain a decree that the assessments were invalid? In this connection, is the city adversely affected by its own delay in issuing the executions? (5) If not, were the assessments confiscatory? As the case was submitted to the judge for determination of all issues with-

out a jury, wherever it is necessary to consider any conflict in the evidence in the record, that view of it must be taken which is most favorable to the prevailing parties. As to the collateral issue above referred to, which was tried along with the main case, it may be said at the outset that the lost ordinance, part of which it was sought to establish, was enacted in 1919; and that according to the views of the court as stated later herein any such ordinance was superseded by subsequent ordinances which also are shown hereinafter; and consequently it is unnecessary to deal with the assignments of error on that part of the judgment which found in favor of establishing the alleged lost part of the ordinance of 1919; nor is it necessary to determine whether the superior court would have authority to establish a lost ordinance, rather than merely to permit proof of its contents. Grounds of the demurrer relating to absence of equity from the petition, existence of adequate remedy at law, and misjoinder of parties plaintiff, are not argued in the briefs filed by counsel for plaintiffs in error. The other grounds of the demurrer are covered by what is hereinafter said.

1. The provisions of the charter of the City of McRae involved here are found in Ga. L. 1918, p. 745, Ga. L. 1925, p. 1181, and Ga. L. Ex. Sess. 1926, p. 137. Sec. 80 of the act of 1918 provides as follows:

"All streets, alleys, sidewalks, pavements, and street crossings shall be under the control, power, and direction of the said mayor and council, and they shall have full and complete power and right to direct the mode, manner, and style in which all street crossings, sidewalks and pavements shall be constructed, paved or unpaved, and in case of failure or refusal of any property owner, after notice, to comply with the ordinances passed by the mayor and council in reference to the construction, paving, or repairs of the sidewalks, pavements, street or street crossings, said mayor and council are hereby authorized and empowered to prescribe that said owners may be fined in a sum not exceeding $500, and to collect the same by execution; they may also direct their officers or persons in their employment, to carry out and execute the provisions of said ordinance in reference to sidewalks, pavements, street and street crossings at the expense of the owner so refusing or failing to comply with said ordinance; and the said mayor and council are hereby empowered to issue executions for said bill of expense against the

said owner, levy and collect same, as in case of execution for taxes; provided, however, that nothing contained in this section or any other part of this charter shall be construed to confer any ministerial power on said mayor or council over the streets, crossings, sidewalks, pavements, public buildings or public works of said city, but the said mayor and council shall have the right to legislate concerning the same and to prescribe by ordinance or resolution the work to be done, the method of doing the same, and shall have charge of the public property, street improvements, street forces, and the performance of all other public work done or performed within the limits of said city, of the character referred to in this and the preceding sections.

" (a) The mayor and council . . shall have full power and authority, in their discretion, to work, clay, grade, pave, macadamize and otherwise improve for travel and drainage the streets and public lanes and alleys of said city, to put down curbing, cross-drains, crossings and otherwise improve the same.

" (b) In order to fully carry into effect the authority above delegated, the mayor and council . . shall have full power and authority to assess the cost of working, claying, grading, paving, and otherwise improving the sidewalks, including two thirds of the necessary curbing for the same, on the real estate abutting on the street, and on the side of the street on which the sidewalk is so improved.

" (c) That the mayor and council . . shall have full power and authority to assess one third of the cost of working, claying, grading, paving, macadamizing, constructing side-drains, crossings and otherwise improving the roadway or street proper, on the real estate abutting on each side of the street improved. . .

" (e) The amount of the assessment on each piece of real estate shall be a lien on said real estate from the date of the passage of the ordinance providing for the work and making the assessment.

" (f) The City of McRae shall have authority to enforce the collection of the amount of any assessment so made for work, either upon the streets or sidewalks, by execution to be issued . . against the real estate so assessed, and against the owner thereof, at the date of the ordinance making the assessment. . .

" (g) The City of McRae shall have full authority to work, clay, grade, repair or contract for the same, the whole surface of the

street, without giving any street railroad company or other railroad company, or other property holder or occupant of the street the option of having the space to be worked or improved by it worked or improved by itself, or by a contractor at its instance, the object of this section being to prevent any delay in the progress of the work and to secure a uniform quality of workmanship.

"(i) The mayor and council shall have full authority to prescribe by ordinance such other rules as may, in their discretion, be necessary to work, clay, grade, pave, macadamize, drain, or curb any of the streets of the city. . .

"Sec. 81. The City of McRae shall have full power to rework, regrade, reclay, repave, and repair any sidewalk, street or alley, and such after proceedings as to levy and collection of assessment therefor as in cases of original work provided for under this act, whenever in the judgment of said mayor and council the work originally done on such sidewalks, streets, or alleys, or portion of sidewalk, street, or alley, is worn to that extent that it is no longer useful as a good pavement, street or sidewalk."

The act approved July 21, 1925, provided for the issuance of street-improvement bonds. Section 2 states that whenever any of the sidewalks, streets, etc., shall have been authorized under the laws and ordinances of the city to be paved or otherwise improved, and the contract has been let and the cost ascertained, the mayor and council shall by written resolution apportion the cost of same pro rata per front foot to the several lots abutting on the area covered by the proposed improvements, "and shall then levy assessments against said abutting property and owners thereof in accordance with such apportionment," this assessment to be paid in ten equal annual installments. Section 3 provides that the first installment of the assessment shall be due on the first day of December next succeeding the date of the levy of the assessment. Section 4 provides that each installment, with the interest, shall be a special lien against the lot so assessed, from the date of the resolution levying the assessment. Section 6 provides that if the levy of the assessment is made after September 1, the first installment and interest shall become due and payable on December 1 of the succeeding year, and "It shall be the duty of said clerk and treasurer upon default in payment of the principal or interest of any assessment or installment herein provided for, at the maturity

thereof, to promptly issue an execution against the lot, . . and against the owner of the property," and to turn the execution over to the marshal, "who shall promptly levy the same" on the property assessed. Section 7 provides that the entire expense of constructing sidewalks, footways, curbing, etc., shall be assessed against the abutting property and shall be paid by the owners; and that one third of the cost of other street improvements shall be assessed against the abutting property and the owners thereof on each side of the street. The act approved March 31, 1926, repealed this section 7, and substituted a provision that the entire expense of making all such street improvements as were authorized by the act of 1925 should be assessed against the property abutting the thoroughfares, and paid by the owners according to the frontage.

After a very careful consideration of the charter powers quoted above, the court is unable to agree with counsel for the defendants in error that the city could itself pave and improve sidewalks and streets only after giving the property owners notice and option to do the work themselves and failure of such owners to comply. In the brief counsel states, "In section 80 [of the act of 1918] it is clearly provided that the city can not do the paving until it has fixed the grade, provided the material it shall be improved with and required the property owner to make the improvement, giving him notice and time within which to do so." That statement is not in accord with this court's construction of section 80. That section is very far from stating that the city must first decide on the grade and other details, and then give the owner notice to do the work, fixing the time within which he must comply, and that only on failure of compliance shall the city have the right to do it. It is of course true that the city has no power unless it is expressly given by the legislature, or must be necessarily inferred from the language which the legislature used; but the whole act and all its parts must be considered in arriving at the intention, and the practical purpose of the statute must be kept constantly in view. The provision in section 80, "All streets, alleys, sidewalks, pavements and street crossings shall be under the control, power, and direction of the said mayor and council, and they shall have full and complete power and right to direct the mode, manner, and style in which all street crossings, sidewalks, and pavements shall be constructed, paved, or unpaved," is very broad, as is also the

provision that "The mayor and council . . shall have full power and authority, in their discretion, to work, clay, grade, pave, macadamize, and otherwise improve," etc. The word "notice" appears but once in the first paragraph of the section. This is in the phrase, "and in case of failure or refusal of any property owner, after notice, to comply with the ordinances passed," etc. Here there is a definite contemplation of ordinances to be passed in pursuance of the power previously given "to direct the mode, manner, and style" in which the paving shall be done; but there is an entire absence of any provision that no ordinance shall be passed for the doing of the work by the city unless it contains an option giving the property owner the first right to do it himself. The broad "discretion" which is undoubtedly vested in the city by the phrases quoted above should not be limited in so important a manner as that involved in the contention under consideration, unless unmistakable language in the act requires it.

Counsel for plaintiffs in error lay stress on paragraph (g) heretofore quoted. Although the language of this paragraph is clearly in harmony with the conclusion reached, it is not considered as controlling. This conclusion is based on the matters above referred to. However, the last phrase in (g) is important: "the object of this section [meaning, presumably, the entire section 80 and all its paragraphs] being to prevent any delay in the progress of the work and to secure a uniform quality of workmanship." It is hardly necessary to discuss the importance of promptness and uniformity when it comes to paving or repairing streets. Not only the property owners but all the residents of the city are interested in their condition; also numberless other people who are neither owners nor residents but who are merely visiting or passing through are similarly interested. It appears that a ruling that it was the intent of the legislature that the authorities of the City of McRae should not have the right to make any street improvements unless the property owners, after notice and opportunity, had failed to make them, would be quite out of line with the plain purpose of the act and all the language used therein. It was the intent of the legislature to give the city authorities the right to say, through proper ordinances, whether the city or the property owners should have the first privilege of paving, improving, and repairing the streets and sidewalks. Judging entirely from the language

used in the act, it can not be held that it was the legislative intent to control such a detail which was so appropriately within the "discretion" recognized in paragraph (a) of this section 80. It is obvious what would be the result if extensive work were in contemplation, and each property owner undertook to do his part of it, having the right to select his own contractor. Confusion, hindrance, delay, and lack of uniformity in the pavements would almost inevitably result. It may have been the legislative intent, by the acts of 1918 and 1925, to give the city authorities the power to provide that the separate property owners should have the optional right referred to if in their wisdom they thought it advisable to do so, but nothing in the acts authorizes a ruling that the authorities were in any and all events required to accord this right to the owners, and that only in instances where the owners failed to perform could the city do the work.

2. The paving ordinances passed by the City of McRae under authority of the act of 1925, and under which the work now in question was done, did not provide that the property owners should be given an option to make the improvements themselves before the city should have the right to make them. Were the ordinances void for this reason? Defendants in error contend that they were, and base this contention mainly on certain earlier ordinances which had been passed and which were not specifically referred to in the general repealing clauses or elsewhere in the later ordinances passed to authorize the work which was done. It appears that in December, 1919, the council adopted a city code containing 703 sections which were thereby approved as the ordinances of the city in full force and effect. Section 647 provided for the making of a map of the street or part thereof to be paved, with stated detailed information; also publication of the estimated cost and other matters in the official newspaper. Section 672 provided: "It shall be the duty of persons owning real estate which fronts or abuts upon any street in the city, upon proper notice served upon them by the chief of police, to lay and maintain in front of or adjacent to such realty a substantial sidewalk of such character and material as is in this Code required." Subsequent sections provided for notice to property owners where sidewalks were worn out, dangerous, and condemned by the city, the owners being required to relay or repair them within ten days. If in the opinion of the street committee a

sidewalk was in a condition which made it dangerous to the general public, the ten-days notice could be dispensed with and the work be done by the city, the costs to be collected from the owner. Work done on any sidewalk by a property owner was to be under supervision of the committee. Section 677 provided: "If any property owner shall be notified as provided in sections 673 and 674 and shall fail within ten days to comply therewith, the street committee shall have said sidewalk laid and put down or repaired at the owner's expense." It is insisted that in view of the terms of these sections the work now in question could not be legally done by the city without first giving the property owners the privilege of doing it. In the first division of this opinion are quoted certain provisions of the city charter of 1918 and the amendment of 1925. The charter of 1918 was the one in force when the city code sections just referred to were passed, and at that time the important changes made by the act of 1925 which put an entirely new complexion on all paving matters in the City of McRae had apparently never been contemplated. Under the act of 1918 it appears that the expense of the work chargeable to the owners was payable promptly, and the city was empowered to issue executions as in the case of unpaid taxes. Under the act of 1925, providing for the issuance of street-improvement bonds, payments by the property owners were to spread over a period of ten years. The object of the "baby-bond" provisions which now appear in so many city charters is to permit the doing of extensive work, covering large areas, without undue hardship on the owners of the property involved. These owners get the immediate benefit of the work, with the resulting enhancement of values which results in perhaps the large majority of instances, and are allowed to pay for it in ten annual installments. Obviously the changes made in the City of McRae's paving situation by the act of 1925 were fundamental. There is nothing in the record to indicate that they were even remotely in contemplation when the City Code of 1919 was adopted.

Very soon after the charter amendment of 1925 was enacted the city set its new plan in motion. The first "general paving ordinance" was passed on November 3, 1925. The work provided for was extensive. It covered thirteen different "projects" for street paving, sidewalks, and curbing. Section 10 of the ordinance stated that "All ordinances and parts of ordinances in conflict with this

ordinance are hereby repealed." It provided for publication of notices, allowance of opportunity for presentation of objections, the making up of apportionment sheets and assessments, and the doing of the work "by contract or otherwise as shall be provided in the specific ordinance authorizing the particular improvement." It appears that all the important preliminaries were complied with. The apportionment sheets, the amounts of the various assessments, and the detailed costs of each separate project appear in the record.

On July 12, 1926, a resolution was passed, confirming the apportionments and assessments, setting out in detail the work to be done, and levying the assessments, the amounts to be paid in ten annual installments, with privilege of payment of the entire amount of any assessment within thirty days, without interest, if the owner preferred. On August 29, 1926, bids for doing the work were received and considered, and one from a named construction company was accepted. During succeeding months other ordinances and resolutions were passed, and amendments were made to the general paving ordinance of November 3, 1925, but it is unnecessary to refer to their contents. After careful consideration of the entire record, it is held that while the sections of the city code of 1919 were not specifically referred to in the "general paving ordinance" of 1925, passed in pursuance of the charter amendment of that year, they were impliedly repealed thereby, if, as is contended, they required that property owners should themselves be given the privilege of making the improvements, and should fail to do so, before the city could have the right to make them. The enabling ordinances which were passed to set in motion the powers created by the act of 1925 were not void for this reason, and there is nothing in the record to authorize a ruling to that effect.

3. Some portions of the executions issued in May, 1934, are now collectible. Other portions are not collectible. Under the act of 1925 the payments were to be made by the property owners in annual installments, and, as previously stated, on failure to pay any one when it was due it was made the duty of the clerk and treasurer to issue an execution promptly. All moneys which were due to be paid more than seven years before the executions were issued are uncollectible, because of the statute of limitations which is pleaded. See *Webb* v. *Atlanta,* 186 *Ga.* 430 (198 S. E. 50), and cit. Had the petition in the case at bar contained no offer to do

equity it would have been subject to the demurrer (*Sharpe* v. *Waycross,* 185 *Ga.* 208 (2), 194 S. E. 522), but it did make the offer and promise in paragraph 23 to pay "whatever it shall be determined by the judgment and decree of this court that petitioners should pay." This being true, the judgment overruling the demurrer was correct.

4. The city contends that the defendants in error are in laches. The work was done in 1925 and 1926, and the petition seeking injunction was not filed until August 31, 1934. The contention is that the property owners could have sought relief nine years earlier, and that by their long inaction the ascertainment of the truth has become difficult. Code, §§ 3-712, 37-119. Counsel for the city calls attention to several things which have happened in the nine years which it is claimed now make it more difficult to ascertain the truth as to some of the matters involved. The former city clerk and treasurer is dead; there has been a loss of a part of one paper; the clerk's successor had difficulty in finding the old books and papers; three witnesses, former city officials, "were confused and doubtful in their recollections, . . the natural result of the lapse of time," etc. In the first place, this court is unable to agree with counsel that any essential truth involved in these matters has been rendered more difficult of ascertainment by the lapse of time which has occurred. The record is a rather unusual one. It is voluminous and comprehensive. It appears to contain every essential thing involved, and the court can not see where any important point now doubtful would not have been equally doubtful if considered nine years earlier. There is no vital trouble, relatively to the facts of the case, which results from lapse of time. The underlying basis of the doctrine of laches is absent. In the second place, the city is equally to blame for the delay. It may be true that the owners, immediately after the liens were placed against their properties, could have moved for their cancellation as clouds on their title, and for injunction, and could have raised every point now presented; but it is equally true that the city could have brought the matter to a head years ago. By section 6 of the charter amendment of 1925 it was made the duty of the clerk and treasurer "to promptly issue an execution against the lot" on default in payment of any annual installment by the property owner. This was not done. No executions were issued until May, 1934.

Some of the defendants in error have never paid anything on their assessments; others paid for awhile, and then stopped paying. Obviously the city could have moved as to all, years ago. The court deems it unnecessary to elaborate the discussion, and it is perhaps sufficient to say that the rule as to laches should work both ways. If both parties are equally to blame for the delay, neither should be allowed to invoke the rule in order to gain an advantage over his adversary. One who seeks equity is required to give effect to all equities of the other party; and where the equities are equal the law will prevail. Equity favors the diligent, the prompt mover; and where both parties could have moved promptly, and neither did, may it not be appropriately said that their *inequities* are equal, and that neither should be allowed to invoke the doctrine of laches to gain an advantage in the litigation? In view of all the facts here presented, the case should not be controlled by the application of that doctrine. It appears to be a general rule that "A delay is excusable when it was induced by the adverse party; he can not take advantage of a delay which he himself has caused *or to which he has contributed.*" (Italics ours.) 21 C. J. 243. This statement involves the proposition just above referred to.

5. The defendants in error contended that the assessments were confiscatory; that their properties had not been benefited by the work, had not been increased in value, and in some instances had been injured. Evidence was introduced which supported some, possibly all, of these contentions. But the city insisted that the property owners were estopped by their inaction to claim confiscation. The court is of the opinion that estoppel existed in this case. The decision in *Mayor &c. of Savannah* v. *Knight,* 172 *Ga.* 371 (157 S. E. 309), whether sound or unsound, is not applicable here. In that case there was no estoppel. The petitioner applied for the injunction before the work was done. In *City of Waycross* v. *Harrell,* 59 *Ga. App.* 615 (1 S. E. 2d, 681), it was ruled that where a city has obtained jurisdiction to make an assessment, and all the provisions of the act authorizing it have been complied with, and the property owner has been given fair opportunity to object, but fails to do so, and stands by and sees the improvement made without entering objection, he is estopped to raise the question of confiscation. This *Harrell* case was carefully considered, and in the opinion appear citations of a number of

decisions which fully support the ruling. Without here repeating the quotations which there appear, attention is called to the cases referred to, especially *Hall* v. *Macon,* 147 *Ga.* 704 (95 S. E. 248), and *Avery & Sons Inc.* v. *Atlanta,* 163 *Ga.* 591 (136 S. E. 789). It was held in the *Hall* case that if the paving ordinance was invalid the city was without jurisdiction to do the work, and although the property owner had made no objection he would not be estopped. But in the case at bar the paving ordinances were not invalid. The *Hall* decision expressly recognizes the rule that inaction will result in estoppel as to any mere irregularity in the proceedings. Also, from the *Avery* case it will be seen that the estoppel extends to any question concerning "the form in which the work is done, or the map made, or any other technicality connected therewith."

In the "general paving ordinance" of November 3, 1925, passed by the City of McRae, it was provided that any objections by property owners should be made in writing to the mayor and council and filed with the clerk. In the resolution and notice of intention to pave streets, dated the same day, the date on which the objections must be filed was stated. The same is true as to the resolution and notice of intention to pave sidewalks, dated March 24, 1926, and of still another resolution dated June 21, 1926. The record shows a stipulation that all these notices and resolutions "had been legally published in accordance with the terms of the resolutions themselves." And nowhere in the record is any evidence that any property owner filed any written objections as required by the resolutions. Mrs. Vashti Rose testified by affidavit that she "protested to the mayor and council and to the contractor," but immediately following her affidavit is a stipulation in the record that her protests were not in writing, were made after the work had started, were not made during the meeting of council, or at any date provided for in any published notice. George H. Harris testified that he was present at each council meeting during the progress of the movement, and that no property owner appeared at any meeting to protest either orally or in writing. In view of all this it must be held that the defendants in error, by their failure to file proper objections, are now estopped to plead confiscation. Also they can not now attack any mere informality or irregularity which may exist in any of the proceedings.

So far as the allegations of inferior and worthless work are con-

cerned, and actual injury to property which it is claimed resulted in some cases, and the evidence adduced as to these matters, it suffices to say that the complainants below could, years ago, have instituted actions for damages based on these claims. Whether they ever did so or not is not shown by the record, and it is unnecessary to consider those matters further. See *Webb* v. *Atlanta,* 186 *Ga.* 430, 441 (supra).

The judgment overruling the demurrer is affirmed. That portion of the final decree of January 27, 1940, which adjudged that the assessments and the liens thereof are null and void, is reversed. That portion which permanently enjoined the city and its officers from levying on and selling any part or all of the property of the named property owners shall be dealt with as follows: It is directed that a further hearing be had for the purpose of ascertaining, as to each of the defendants in error, the amount due by him or her after crediting partial payments heretofore made, and eliminating all installments which were due to be paid more than seven years before the date of the executions. A date will then be fixed by the court for the payment of the sums so found to be collectible. When that date is passed an order must be entered which will have the effect of continuing in force the present permanent injunction in favor of each property owner who has made the payment found to · be due by him or her, and vacating the injunction as to any property owner who has not made the payment so found to be due, and permitting the executions to proceed for the amounts ascertained.

*Judgment affirmed in part and reversed in part, with direction. All the Justices concur.*