29071, 29072. CITY OF CALHOUN et al. v. NORTH GEORGIA ELECTRIC MEMBERSHIP CORPORATION et al.; and vice versa.
29106. GEORGIA POWER COMPANY v. CITY OF CALHOUN et al.

PER CURIAM.

This appeal challenges the constitutionality of the Georgia Territorial Electric Service Act (Ga. L. 1973, p. 200 et seq.), hereinafter referred to as the Act.

The action arose when the City of Calhoun, Milton Stewart and the City of Cartersville sought a declaratory judgment as to the constitutionality of the Act against the North Georgia Electric Membership Corporation, Georgia Power Company and the Public Service Commission in the Superior Court of Fulton County. Thirty-four other electric membership corporations were allowed to intervene.

After an interlocutory hearing at which the trial court found that it had jurisdiction of the parties and that justiciable controversies existed between them, it issued

orders granting an interlocutory injunction to preserve the status quo and confining the issues to be tried to the constitutional questions raised by the pleadings. The case proceeded to trial without a jury and on March 20, 1974, the court entered its order holding the Act to be constitutional.

Plaintiffs Stewart and the two cities appeal that judgment. The cross appeals by Georgia Power Company and North Georgia Electric Membership Corporation present the question of whether the two cities were estopped to deny the constitutionality of the Act because of specified past conduct.

The issues raised by the main appeal are essentially those which follow: (1) that the Act provides for regulation and taxation of municipally owned and operated electric systems and utilities in violation of Art. IV, Sec. I, Par. I (Code Ann. § 2-2401) and Art. VII, Sec. VII, Par. V (Code Ann. § 2-6005) of the Georgia Constitution; (2) that it establishes a monopoly throughout the state with respect to certain electric consumers without regard to the rates to be charged, and authorizes contracts between electric suppliers for the division of exclusive territories in violation of Art. IV, Sec. IV, Par. I (Code Ann. § 2-2701) of the Georgia Constitution; (3) that it provides for the assignment of exclusive areas and for unassigned areas on an arbitrary basis which precludes the uniform operation of the Act as required by Art. I, Sec. IV, Par. I (Code Ann. § 2-401) of the Georgia Constitution; (4) that it delegates authority to the Public Service Commission to assign or to declare unassigned certain territories for electric service without adequate standards, which authority is legislative in nature and in violation of Art. III, Sec. I, Par. I (Code Ann. § 2-1301) of the Georgia Constitution; and (5) that it classifies electric consumers into two classes, treats such classes in a wholly different manner, and such classification bears no relationship to the objects of the Act and is arbitrary and unreasonable in violation of Art. I, Sec. I, Par. II (Code Ann. § 2-102) and Art. I, Sec. IV, Par. I (Code Ann. § 2-401) of the Georgia Constitution.

1. At the outset it should be recognized that before an Act of the legislature can be declared unconstitutional,

the conflict between it and the fundamental law must be clear and palpable and this court must be "clearly satisfied of its unconstitutionality." *Sister Felicitas v. Hartridge,* 148 Ga. 832, 836 (98 SE 538); *Franklin v. Harper,* 205 Ga. 779, 790 (55 SE2d 221) and cits. If the Act is "equally susceptible of two constructions, one of which will harmonize it with the constitution and the other of which will render it unconstitutional, the former construction is generally to be preferred." *Fordham v. Sikes,* 141 Ga. 469 (a) (81 SE 208); *Sumter County v. Allen,* 193 Ga. 171, 174 (17 SE2d 567). "It is, of course, fundamental that 'the cardinal rule to guide the construction of laws is, first, to ascertain the legislative intent and purpose in enacting the law and then to give it that construction which will effectuate the legislative intent and purpose.' *Ford Motor Co. v. Abercrombie,* 207 Ga. 464, 467 (62 SE2d 209)." *City of Jesup v. Bennett,* 226 Ga. 606, 608 (176 SE2d 81).

Section 2 of the Act under review (Ga. L. 1973, pp. 200, 201) provides the following legislative findings and declaration of intent. "The public interest requires, and it is hereby declared to be the policy of the State of Georgia, that, in order (1) to assure the most efficient, economical and orderly rendition of retail electric service within the State, (2) to inhibit duplication of the lines of electric suppliers, (3) to foster the extension and location of electric supplier lines in the manner most compatible with the preservation and enhancement of the State's physical environment, and (4) to protect and conserve the lines heretofore and hereafter lawfully constructed by electric suppliers, it is necessary and appropriate that the State establish and implement a plan whereby every geographical area within the State shall be either assigned to an electric supplier or declared unassigned as to any electric supplier; that, to accomplish such a plan, it is necessary that all electric suppliers within the State be subject to this Act as provided; that the Public Service Commission be delegated power, authority and jurisdiction with respect to such plan; and that all electric membership corporations and all municipalities which furnish retail electric service be additionally subject to regulation by the Public Service Commission in the same

manner as provided for regulation of electric light and power companies, except as to the fixing of their rates, charges and service rules and regulations, it being determined by the General Assembly that such electric membership corporations and municipalities, which by their corporate nature are wholly or substantially controlled by their consumers, should for regulatory purposes be classified differently in certain respects from the electric light and power companies."

Therefore, in light of the above stated legal principles, our consideration of each constitutional attack raised by the appellants must be guided by the legislative intent and policy specifically declared within the Act itself.

2. The appellants contend in enumerations of error 1 and 2 that the Act violates Art. I, Sec. I, Par. I and Art. VII, Sec. VII, Par. V, supra, because those provisions of the Georgia Constitution prohibit regulation and taxation of municipally owned and operated utilities except as specifically provided.

Art. IV, Sec. I, Par. I, which confers upon the General Assembly certain power and authority in the regulation of railroads and public utilities, is qualified by the following language: "provided, nevertheless, that such power and authority shall never be exercised in any way to regulate or fix charges of such public utilities as are or may be owned or operated by any county or municipality of this State; except as provided in this Constitution."

It is argued that the above-quoted proviso is a general restriction on the power of the General Assembly over municipal utilities, and that the only exception to this restriction is contained in the proviso to Art. VII, Sec. VII, Par. V, which subjects municipalities, counties or other political subdivisions to the same taxation and regulation as private utilities if they use revenue bonds to finance utility operations outside of the county in which they are located. Appellants urge in effect that the municipally owned and operated electric systems here involved are totally immune to any regulation of their activities.

In our view this argument is specious.

Section 15-A recites that "No provision of this Act, or application thereof, shall be construed in any way to

regulate or fix charges of county-owned or municipality-owned or operated public utilities, as prohibited by Art. IV, Sec. I, Par. I . . ."

The proceedings of the Constitutional Commission of 1943-1944 show that the proviso to Art. IV, Sec. I, Par. I of the Georgia Constitution of 1945 was intended only to prohibit the General Assembly from regulating or fixing the charges of municipally owned or operated electric systems. Therefore that provision does not deal with every aspect of the General Assembly's broad, inherent powers over both public utilities and municipal corporations. See in this regard, *Atlanta Terminal Co. v. Georgia Public Service Comm.,* 163 Ga. 897 (137 SE 556); *Troup County E. M. C. v. Georgia Power Co.,* 229 Ga. 348, 352 (191 SE2d 33).

As shown by the *Atlanta Terminal* case, supra, this constitutional provision should not be construed to restrict these powers of the General Assembly unless it is clearly and indisputably shown that the legislation was intended as a restriction of the scope and extent urged. We conclude that this was not done here. Moreover, Section 15-A specifically disavows any intent to violate Art. IV, Sec. I, Par. I.

The subject of Art. VII, Sec. VII, Par. V is revenue anticipation certificates and the proviso simply recites that the use of revenue bonds to construct or operate utilities outside the county in which the political subdivision is located will subject gas or electric operations to full regulation and taxation as a private utility. Neither alone, nor construed in conjunction with Art. IV, Sec. I, Par. I, does this provision prohibit the General Assembly from regulating municipally owned or operated electric utilities.

3. The third enumeration contends that Sections 9, 10 and 11 of the Act "regulate or fix" the charges of municipally owned or operated electric systems for service rendered to customers within the city limits and therefore violate Art. IV, Sec. I, Par. I and Art. VII, Sec. VII, Par. V of the State Constitution.

We do not agree.

This argument is based upon the overly restrictive interpretation of these two constitutional provisions

which we rejected in Division 2, supra. Moreover, the term "regulate or fix" refers to the dollar amount to be charged electric customers and these sections do not attempt to interfere with either the municipality or the electric membership corporation in the establishment of their rate levels. Subsections 9 (c) and (e) confer certain jurisdictional and enforcement powers upon the Public Service Commission over municipal electric suppliers. Section 10 prohibits electric suppliers from having or applying discriminatory rates, charges or service rules and regulations and from engaging in certain other practices. Section 11 makes electric membership corporations and municipalities furnishing electric service inside the state subject to the jurisdiction of the Public Service Commission "in the same manner as electric light and power companies are . . . , except that their rates, charges, service rules and regulations shall be filed with the Commission and shall be subject to the provisions of Section 10 of this Act but shall not otherwise be fixed by the Commission," except for certain securities. It should also be noted that the restrictions set forth in Section 10 (a) and (b) are specifically not applicable to municipal utility actions within city limits.

In our opinion, it is clear that these sections do not constitute an unlawful attempt to regulate or fix the charges of municipal utilities as contended by the appellants.

4. The fourth enumeration alleges that the Act does not have uniform application in the counties of this state in compliance with Art. I, Sec. IV, Par. I of the Georgia Constitution because it bases assignments of service area on the location of "lines" and exempts electric consumers having a connected demand of 900 kilowatts or greater.

Appellants contend that the Act does not have uniform application because its effects on municipal electric suppliers are not identical to its effects on other electric suppliers due to the definition of "line" in Section 3 (d) of the Act and the large load exception for customers with connected loads in excess of 900 kilowatts; and because all or most of the lines of the cities are within city limits where there is little undeveloped space, while lines of other electric suppliers are outside the city where there

is more undeveloped area.

(a) The Act defines a "line" as "any conductor for the distribution or transmission of electricity other than a conductor operating at a potential of 120,000 volts or more."

We do not perceive this to be an arbitrary or capricious definition, but instead find it is reasonably related to the purposes of the Act. Clearly it is a relevant classification in the electric utility industry where the lines of the electric suppliers are the most tangible evidence of their distribution system and service rendered to their customers.

(b) Nor does basing assignments of service areas primarily on the presence or absence of electric lines violate Art. I, Sec. IV, Par. I.

The claim that the bases for assignments are "unequal" attempts to transform that constitutional provision into a guarantee that all legislation will affect all persons identically. However, the issue is not whether the Act produces a uniform effect upon every electric supplier, but whether it applies uniformly to all electric suppliers throughout the state. If the Act "operates generally upon the entire class of subjects with which it deals uniformly throughout the state . . ." there is no merit in a constitutional attack upon this ground. *Talley v. Sun Finance Co.,* 223 Ga. 419, 420 (156 SE2d 55). See also *Wright v. Hirsch,* 155 Ga. 229 (116 SE 795).

The appellants have also failed to show that such a basis for assignment is wholly without rational relationship to the purposes of the legislation.

Section 4 (b) provides that the assignments shall be made "as determined by public convenience and necessity, having primary regard for the location of electric suppliers' lines . . ." As set forth in Section 2 of the Act quoted in its entirety in Division 1, supra, the Act has several purposes, including the orderly furnishing of electric service and minimizing interference. Both of those goals can be accomplished by basing assignments primarily upon location of existing lines.

In the final analysis, however, "The expediency of legislation is a matter for determination by the General Assembly *(Beall v. Beall,* 8 Ga. 210; *Winter v. Jones,* 10 Ga.

190, 54 AD 379), and not by this court; nor will this court inquire into the motives of the General Assembly in the enactment of legislation. *Clements v. Powell,* 155 Ga. 278 (116 SE 624)." *Tripp v. Martin,* 210 Ga. 284, 288 (79 SE2d 521).

(c) The provision in Section 9 (a) of the Act, which allows consumers with a connected load of 900 kilowatts or greater to select their electric supplier, was likewise not shown to be an unreasonable, arbitrary, and therefore unconstitutional, classification. Any competitive advantage in favor of the appellee Georgia Power Company for large-load customers results not from the operation of the Act, but from the nature and characteristics of the suppliers. Thus any disadvantage which the appellant cities may suffer would not amount to a constitutional deprivation. The contention that the growth of their electric system will be inhibited by the Act due to the fact that most of their lines are within city limits is unfounded. From the abundance of economic and engineering evidence offered at the trial, the court was amply authorized to conclude that neither the Act nor any provision thereof operated in a non-uniform manner as prohibited by Art. I, Sec. IV, Par. I of the Georgia Constitution.

5. Enumeration 5 recites that the trial court erred in holding that the Act does not violate Art. IV, Sec. IV, Par. I of the State Constitution "in the delegation of powers to the Public Service Commission."

The trial court found that "The delegation of quasi-legislative power to the Public Service Commission to assign service areas to electric utilities does not violate Art. IV, Sec. IV, Par. I," and that "said Act contains adequate standards to guide the Public Service Commission in exercising the power delegated to it."

Art. IV, Sec. IV, Par. I pertains to contracts which might defeat or lessen competition or encourage monopoly, and prohibits the General Assembly from authorizing such contracts. Art. III, Sec. I, Par. I, which vests the legislative power of the state in the General Assembly, is apparently the subject of the appellants' arguments and the trial court's rulings. Since the order holds that the Act "is not repugnant to any of the

Constitutional provisions alleged *or argued,"* however, challenges to both provisions will be treated under this enumeration. (Emphasis supplied.)

(a) Section 4 of the Act authorizes the Public Service Commission to assign to electric suppliers, or to declare unassigned, all geographical areas located outside the corporate limits of any municipality according to certain specified standards.

Appellants contend that this section will allow exclusive territorial monopolies created by agreements among electric suppliers summarily approved by the commission.

However, under the standards set forth in the Act, even though a particular area may be assigned to an electric supplier, other electric suppliers already serving customers in that area may continue to serve those customers as well as new customers located near their lines. Thus there is no *exclusive* territory. Moreover, the rules of the Public Service Commission relating to assignment procedures under the Act provide that the commission will approve only *reasonable* agreements which it finds to be in the public interest.

It is conceded that not all restraints of trade are unconstitutional and that the test in Georgia is whether the restraint involved is "injurious to the public interest." *State v. Central of Ga. R. Co.,* 109 Ga. 716, 717 (35 SE 37, 48 LRA 351).

The long history of regulated monopoly in this state shows that the General Assembly is free to restrict competition among public utilities where, in the judgment of the legislature or its duly authorized delegate, such competition may be injurious to existing public service. See, e.g., The Motor Contract Carrier Act (Ga. L. 1931, Ex. Sess., p. 99 et seq.; Code § 68-501 et seq.); The Motor Common Carrier Act (Ga. L. 1931, p. 199 et seq.; Code § 68-601 et seq.); Ga. L. 1950, p. 311 (Code Ann. § 93-324), requiring a certificate of public convenience and necessity to operate a telephone system in this state, or an intrastate pipeline system (Ga. L. 1956, pp. 104, 107; Code Ann. § 93-707); and the Georgia Radio Utility Act (Ga. L. 1972, p. 439 et seq.; Code Ann. § 93-901 et seq.).

Indeed, "The regulation of utilities is now ordinarily

based on the theory of regulated monopoly rather than competition, and the power to regulate carries with it the power to protect utilities against indiscriminate competition, and should be exercised to that end . . . [T]he primary purpose is to serve the interests of the public and not to establish a monopoly or to guarantee the security of investment in public service corporations." 73 CJS 1006, Public Utilities, § 12. See also, 54 AmJur2d 957, Monopolies, etc., § 507; Priest, Principles of Public Utility Regulation, p. 1 (1969).

As shown by Section 2 of the Act, supra, it is clear that the General Assembly determined that unrestricted competition between electric suppliers could injure existing public service and otherwise adversely affect the public interest. Appellants have not shown that these legislative findings, intent and action are without rational basis. Rather, the record is replete with evidence to show that to the extent the assignment of service areas under the Act restrains competition, the restraint is for the benefit of the public in minimization of duplication of facilities and prevention of other adverse economic and environmental effects.

(b) There is likewise no merit in the attack based upon Art. III, Sec. I, Par. I.

The appellants argue that Section 4 of the Act unlawfully delegates legislative power to the Public Service Commission because it does not contain sufficiently definitive standards to govern the commission in making assignments of service areas and declaring unassigned areas.

In *Bohannon v. Duncan,* 185 Ga. 840, 843 (196 SE 897) (1 Justice dissenting and 1 Justice disqualified), the Georgia Milk Control Act was attacked upon the ground, among others, that it was an unconstitutional delegation of authority. This court there held that "while it is necessary that a law, when it comes from the law-making power shall be complete, still there are many matters as to methods or details which the legislature may defer to some designated ministerial officer or board. [Cit.] The constitutional prohibition, therefore, does not deny to the law-making body 'the necessary resources of flexibility and practicality, which will enable it to perform its

function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply.' [Cits.]"

These principles have been applied in numerous other instances of delegation of power to administrative bodies, some of which were broader than the powers delegated in the Act here challenged. See e.g., *Williamson v. Housing Authority of Augusta,* 186 Ga. 673 (199 SE 43) (power to determine nature, extent, location and financing of housing projects); *Telford v. City of Gainesville,* 208 Ga. 56 (65 SE2d 246) (power to determine which buildings in housing projects would be demolished, which would be closed and condemned and which would be repaired or improved); *Bedingfield v. Parkerson,* 212 Ga. 654 (94 SE2d 714) (power to reorganize schools and determine the number of grades to be taught at each school); *Jenkins v. Manry,* 216 Ga. 538 (118 SE2d 91); and *Pearle Optical v. State Board of Examiners,* 219 Ga. 364 (133 SE2d 374) (delegation of power to occupational examining boards.)

We think they are applicable here.

Section 2 sets out the purposes of the Act, which we have held to be appropriate. These purposes are put into effect completely and thoroughly by other provisions. The Public Service Commission is delegated the authority only to apply the standards set forth in the Act, to make rules and regulations according to such standards and to administer them.

The appellants' argument that this authority cannot properly be exercised to assign service areas for municipal utilities cannot be sustained. If the Act here is considered unconstitutional because the power cannot be delegated to the Public Service Commission to make assignments of retail electric territories, then assignments of truck routes, rail routes, telephone service areas and gas service areas must also fail. If it is struck down on the ground that its tendency to lessen competition conflicts with the Constitution the entire regulatory scheme fashioned by the Georgia Legislature will be effectively destroyed. Such a result would be unreasonable and cannot be

condoned.

We find no violation of either Art. IV, Sec. IV, Par. I or Art. III, Sec. I, Par. I of the Georgia Constitution.

6. The appellant Milton Stewart complains that Subsection 9 (a) of the Act constitutes a denial of equal protection of the laws under Art. I, Sec. I, Par. II of the State Constitution because it allows customers with a connected demand of 900 kilowatts or greater to choose their electric supplier, regardless of the assignment of areas; and that because his own kilowatt load requirement is under the dividing line laid down in the Act, and he thus cannot choose his electric supplier, he is being denied equal protection.

As this constitutional provision has been repeatedly interpreted by this court, "It is only in cases where laws are applied differently to different persons under the same or similar circumstances that the equal protection of the law is denied. *City of Valdosta v. Harris,* 156 Ga. 490 (4) (119 SE 625); *Georgia Southern & Florida R. Co. v. Adkins,* 156 Ga. 826 (120 SE 610)." *Baugh v. City of LaGrange,* 161 Ga. 80 (2a) (130 SE 69). Thus it is recognized that "Classification is permitted, provided it be upon any reasonable basis." *Carmichael v. Atlanta Gas-Light Co.,* 185 Ga. 34, 37 (193 SE 896).

The expert testimony presented here was clearly sufficient to establish that at some point in the size of the electric load to be served there was a justification for allowing customers to select their suppliers; and that the exemption allowing large-load customers free choice was not arbitrary, capricious or wholly unreasonable but based upon real differences between the two groups of customers and between the effects upon electric utilities and the communities in which they locate. The argument that it is unfair for a customer with an 850 kilowatt connected load to have no choice as to suppliers, while one with a 950 kilowatt connected load has a choice, is really no more than a quarrel with the point where the legislature chose to draw the dividing line between large-load and small-load customers. In our view, the appellants have not met the burden required in proving that a statute is palpably unconstitutional, and therefore it must be upheld. *Wright v. Hirsch,* 155 Ga. 229, 233,

supra.

7. Appellant's seventh enumeration is a general attack on the Act as a whole, alleging that it is contrary to the public interest and that the trial court erred in its findings upon which its conclusion of constitutionality was based.

Such a contention does not rise to the level of a constitutional attack which can be considered on its merits. Courts cannot consider statutes unconstitutional unless they violate the express words of the Constitution (*Sister Felicitas v. Hartridge,* 148 Ga. 832, 836, supra) nor declare them void upon the ground that they are contrary to the principles of justice and equity (*Gray v. McLendon,* 134 Ga. 224 (11) (67 SE 859)).

Moreover, "As the case was submitted to the judge for determination of all issues without a jury, wherever it is necessary to consider any conflict in the evidence in the record, that view must be taken which is most favorable to the prevailing parties." *City of McRae v. Folsom,* 191 Ga. 272, 276 (11 SE2d 900).

Accordingly, for the reasons set forth above, based upon the applicable law and in light of the evidence, we conclude that the appellants have failed to show that the Georgia Territorial Electric Service Act is clearly or palpably unconstitutional for any reason assigned. In view of this disposition it is unnecessary to consider the questions of estoppel and waiver raised by the cross appellants North Georgia Electric Membership Corporation and Georgia Power Company.

*Judgment affirmed in main appeal. Cross appeals dismissed. All the Justices concur, except Ingram, J., who dissents. Jordan, J., disqualified.*

ARGUED SEPTEMBER 12, 1974 — DECIDED FEBRUARY 4, 1975 — REHEARING DENIED FEBRUARY 25, 1975.

*Thomas L. Shanahan,* for City of Calhoun.

*Al D. Tull,* for City of Cartersville.

*Heard, Leverett & Adams, L. Clifford Adams, Jr.,* for City of Calhoun.

*Chance & Maddox, J. C. Maddox,* for Stewart.

*Pittman, Kinney, Kemp, Pickell & Avrett, L. Hugh Kemp,* for N. Ga. Electric Membership.

*Troutman, Sanders, Lockerman & Ashmore, James E. Joiner, Jeffery R. Nickerson,* for Ga. Power Co.

*Arthur K. Bolton, Attorney General, Timothy J. Sweeney, Assistant Attorney General, Robert J. Castellani, Deputy Assistant Attorney General,* for Public Service Commission.

*James C. Brim, Jr., Richard G. Tisinger,* for intervenors.

INGRAM, Justice, dissenting.

In my opinion, the present statute violates Art. IV, Sec. I, Par. I of the Constitution of Georgia despite the disclaimer provisions contained in § 15A of the Act which disavow any intention to violate the Constitution. The records of the Constitutional Commission of 1943-1944 show the following with respect to this section of our Constitution: "Chairman Arnall: '. . . We get back to the fundamental involved in this paragraph, it merely confers on the General Assembly the right to regulate utilities unless the Assembly by statute or enactment provides that municipally owned and county owned utilities shall be regulated by the Georgia Public Service Commission. It is the opinion of the Chair this regulation remains in the hands of the municipality or county involved. However, the Chair is perfectly willing and will be quite delighted, if it meets the approval of this Commission, to refer this paragraph to a committee comprised of Judge Grice, Judge MacIntyre and Attorney General Head to report to us whether or not the paragraph, if adopted as read, will in any way subject the locally owned, municipally owned water works and power plants to regulations of the Public Service Commission in the absence of the Act of the General Assembly, and thereby we could all be satisfied of the effect of what we are doing. . .' Mr. Durden: '*I also suggest this committee have the authority to include in there the specific prohibition to exempt plants owned by cities and counties.*' Mr. Gowen: 'I object. I don't think we ought to tie the hands of the legislature and say the legislature in its wisdom could not undertake to subject these if they decide

to. I don't see — if you're going to start in tying the hands of the General Assembly in order to protect every municipality in the State of Georgia, I'm afraid you won't have much Constitution. Chairman Arnall: 'Without objection, this paragraph will be referred to the committee just suggested for study and report back to the full Commission. Is there objection to that? If there is none, it is so ordered. . .' " (Emphasis supplied.) Records of Constitutional Commission, 1943-1944, Vol. I, pp. 175, 176.

Volume II of the Records of the Constitutional Commission contains the following action by the Commission after receipt of the Committee's report: "Judge Grice: '. . . I rise now on another matter. We passed over a section of the report of Mr. Lovejoy and it was referred to Judge MacIntyre and Mr. Head and myself to offer an amendment. It relates to the Railroad Tariffs, and we have our reports, and since we passed that, we should complete it.' Acting Chairman Harris: 'The clerk will read the report.' Mr. McCutcheon: 'Paragraph I of § II of Art. IV dealing with Railroad Tariffs. Paragraph I. Public Utility Tariffs and Charges. The power and authority of regulating railroad freight and passenger tariffs and of charges of public utilities for their services, of preventing unjust discriminations, and requiring reasonable and just rates of freight and passenger tariffs and of charges of public utilities, are hereby conferred upon the General Assembly, whose duty it shall be to pass laws from time to time to regulate such tariffs and charges, to prohibit unjust discrimination by the various railroads and public utilities of this State, and to prohibit said railroads and public utilities from charging other than just and reasonable rates, and to enforce the same by adequate penalties.' Acting Chairman Harris: 'That is on page VIII of the Subcommittee No. III. *The effect of this, as I understand it, is to exempt utilities from the rate making of the Public Service Commission, where they are owned by municipalities or counties. Is there any objection to the adoption of the amendment? The Chair hears none, and the amendment is adopted.*' " (Emphasis supplied.) Records of Constitutional Commission, 1943-1944, Vol. II, pp. 122-123.

The amendment which was adopted added the following provision to this paragraph of the Constitution: "Provided, nevertheless, that such power and authority shall never be exercised in any way to regulate or fix charges of such public utilities as are or may be owned or operated by any county or municipality of this State." The General Assembly changed the period at the end of the proposed paragraph to a semicolon and added, "except as provided in this Constitution."

When the General Assembly added the words, "except as provided in this Constitution," it was done to accommodate that paragraph of the Constitution to the provision contained in Art. VII, Sec. VII, Par. V of the Constitution, which provides for regulation and taxation of municipal utilities operating beyond the limits of the county in which the municipality is located. Consequently, it seems to me that the framers of the 1945 Constitution clearly intended to limit the power of the General Assembly by the constitutional prohibition that was added to the original section. This provision plainly says that the power and authority of the General Assembly "shall never be exercised in any way to regulate or fix charges" of municipally owned public utilities. I realize that § 15A of the present Act contains a disclaimer that the Act was not intended to violate this section of the Constitution. Nevertheless, when the entire statute is read it is apparent that the Public Service Commission cannot carry out all of the duties conferred upon it by this statute without violating this section of the Constitution. See §§ 9, 10 and 11 of the Act.

I take no delight in expressing the opinion that the General Assembly did not have the constitutional power to enact the regulatory sections of this legislation. I have joined in other decisions of this court which hold that the General Assembly has the power to do almost anything it wants to unless that power is restrained by the Constitution. In my view, this is one of the places where the Constitution places a restraint upon the power of the General Assembly of Georgia, and it is the duty of this court to uphold that restraint. Consequently, it is on this basis that I must dissent to the majority opinion. The words of the prohibition contained in this portion of the

Constitution are too plain and clear to admit of any other construction except that it was intended to prevent the General Assembly from exercising power and authority in any way to regulate or fix charges of municipally owned utilities when operating inside the counties in which they are located.

Several sections of the present Act constitute an attempt by the General Assembly to delegate this authority to the Public Service Commission and if the General Assembly is forbidden by the Constitution to do it, a fortiori, it cannot delegate this power and authority to the Public Service Commission to do it. Therefore, I must dissent.