A90A1462. CITY OF NORCROSS v. GEORGIA POWER
COMPANY.
(399 SE2d 725)

COOPER, Judge.

This is an appeal from the order of the superior court which affirmed a decision of the Georgia Public Service Commission.

Appellant and appellee are both electric suppliers under the Georgia Territorial Electric Service Act, OCGA § 46-3-1 et seq. (the "Act"). The Act establishes assigned geographical service areas within which an assigned electric supplier has the exclusive right to provide electric service subject to certain specified statutory exceptions. At issue in this case is the interpretation of one of those exceptions — OCGA § 46-3-8 (a) — the so-called "large load" exception, which states that the consumer may choose a different electric supplier than the one assigned under the Act if the "service [is] to one or more new premises (but if more than one, such premises must be located on the same tract or on contiguous tracts of land), if [the premises is] utilized by one consumer and [has] single-metered service and a connected load which, at the time of initial full operation of the premises, is 900 kilowatts or greater. . . ." Appellant alleges that appellee is violating the Act and the "large load" exception by providing electric service to a multi-building office park located within appellant's service territory. The premises (the "Premises") is being developed in phases on approximately 100 acres. Phase One, at issue in this case, involves 15.7 acres and three separate leased buildings plus a confer-

ence center for use by all the tenants. The three buildings were built as "shells" and were to be completed on the interior as they were leased and occupied by tenants. Prior to beginning construction on the Premises, the developer contacted appellant regarding electricity and was told that a fee, payable in advance, would be required for underground facilities. Upon contacting appellee, the developer was told that appellee could provide the service with no up-front fee if the 900 kilowatt and the other requirements of the "large load" exception could be met. At that time, a representative of appellee made estimates and calculated that the requirements could be met and service was subsequently provided by appellee. Just prior to the administrative hearing, and well after the buildings had been completed and substantially leased and occupied, appellant's experts performed an inspection of the Premises and determined that if all the buildings were considered together, the total connected load at that time exceeded 900 kilowatts.

The issues to be determined at the hearing were whether the Premises constituted one premises or several premises under the Act, whether the Premises are utilized by one consumer, whether the Premises have single-metered service, and whether the connected load to the Premises at the time of initial full operation was 900 kilowatts or greater. After much discussion of these issues, the hearing officer determined that the service to the Premises as provided by appellee satisfied all the requirements of the "large load" exception and found for the appellee. This decision was reiterated by the hearing officer in his written opinion on motion for reconsideration. Appellant's application for review by the full Commission was denied, and the orders of the hearing officer became the decision of the Commission. Upon judicial review, the superior court affirmed the decisions of the hearing officer, and hence the Commission.

1. In the absence of guiding case law or specific legislative instruction, we are called upon to review the construction of the Act made by the hearing officer and the superior court. We are mindful in this task that " 'the cardinal rule to guide the construction of laws is, first, to ascertain the legislative intent and purpose in enacting the law and then to give it that construction which will effectuate the legislative intent and purpose.' [Cits.]" *City of Calhoun v. North Ga. EMC*, 233 Ga. 759, 761 (1) (213 SE2d 596) (1975). Further, we are aware that " '[i]t is an elementary rule of statutory construction that, absent clear evidence to the contrary, words should be assigned their ordinary, logical, and common meaning.' [Cits.]" *Kirk v. Lithonia Mobile Homes*, 181 Ga. App. 533 (2) (352 SE2d 788) (1987). Although the legislature did not state the policy and intent behind the "large load" exception, we are guided by the stated policies leading to the creation of assigned electrical areas and suppliers and the passage of

the Act as a whole, which are "(1) to assure the most efficient, economical, and orderly rendering of retail electric service within the state, (2) to inhibit duplication of the lines of electric suppliers, (3) to foster the extension and location of electric supplier lines in the manner most compatible with the preservation and enhancement of the state's physical environment, and (4) to protect and conserve lines lawfully constructed by electric suppliers. . . ." OCGA § 46-3-2. The general restriction of competition among electrical suppliers resulting from the Act is lifted for the specific large load consumers delineated in the exception, who are granted a free choice of suppliers. See *City of Calhoun*, supra at Division 6. Thus, the "large load" exception, being an exception to the general rule of competitive restriction, must be strictly construed. See *Dalton Brick &c. Co. v. Huiet*, 102 Ga. App. 221 (2) (115 SE2d 748) (1960). After a thorough review of the record in this case, the briefs submitted by the parties, and the language of the Act and the exception, we conclude for the following reasons that the construction of the exception advanced by the hearing officer and the superior court does not comport with the legislative intent and the plain language of the Act. Consequently, we reverse.

2. We first disagree with the lower decisions on whether the Premises is utilized by one consumer and whether the Premises has single-metered service as contemplated by the legislature in formulating the "large load" exception. At issue are four separate buildings used and occupied by many different tenants. The tenants lease the spaces from the owner/developer. Although currently the buildings are leased, there is evidence in the record that options to buy have been and may in the future be offered to the tenants, so that the tenant would then become the owner of the property. The owner/developer is the entity that contracted with appellee for power and is responsible for paying the electric bill directly to appellee. The total service to the Premises is read through a single "master" meter, however each tenant's space is separately metered and read by the owner/developer to measure the electricity used by each tenant. The owner/developer then bills each tenant for his pro rata share of the total bill plus other costs related to the provision of the electrical services. Considering the type of development and the arrangement for electrical services as a whole, and giving the terms of the statute their "ordinary, logical, and common" meaning (*Kirk*, supra at Division 2), we do not feel that this is the type of large load consumer meant to receive the benefits of the exception to competitive restriction inherent in the Act. Although neither the term "consumer" nor the word "utilized" is defined in the Act, the Premises cannot in substance be, or considered to be, utilized by one consumer, the owner/developer, especially in light of the evidence that the Premises was not conceived as a unified rental premises for its entire useful life. Contrary to the

hearing officer, we do see a distinction between the instant situation and that of a single, multi-tenant office building that is conceived, used and will continue to be used as a unified rental premises, owned and operated by one entity. We feel that the substance of the term "one consumer" could well apply in the latter situation. Further, the metering arrangement for the Premises does not comply in substance with the single-meter requirement of the exception. The arrangement adopted and the statutory construction advanced by the hearing officer and the lower court are means to technically confer the benefits of the exception upon a premises that would not otherwise be within the contemplation of the legislature. Strictly construing the exception, we must reverse the superior court.

3. Although our opinion in Division 2 is sufficient to sustain our reversal of the lower court, we also conclude that, even if our opinion in Division 2 were otherwise, the evidence presented at the hearing was not sufficient to show that the Premises had a connected load at the time of initial full operation of 900 kilowatts or greater. Neither "connected load" nor "initial full operation" is defined in the Act. Experts testified at the hearing, and the hearing officer assumed, that "connected load" was the hard-wired, or permanent, electrical facilities designed into the building and did not include any portable electrical connections that can be plugged in or out. Also, experts testified, and the hearing officer assumed, that "initial full operation" was the time that the buildings were initially ready for occupancy. In the case of shell buildings, it was agreed by the experts that, at the time a building was available for occupancy, a prospective estimation of the average hard-wired requirements for an average tenant would have to be made to arrive at a determination of connected load. The only estimations of the amount of connected load of the Premises submitted into evidence were the calculations of appellee's representative done prior to the commencement of construction and the inspections performed by appellant's experts years after actual occupancy had been achieved. The calculations of appellee's representative included a miscellaneous category of the portable load, and when this category was deleted, the total load of all the buildings was estimated at less than 900 kilowatts. The hearing officer based his decision on the testimony of the appellant's expert that the hard-wired load of a building would not normally change over time as tenants occupied space. The officer then reasoned that what was measured immediately prior to the hearing was what was present in the building at the time of occupancy. This same expert, however, went on to testify that certain tenants do place different requirements on the hard-wired load and that the load may differ between the time that the owner/developer initially opens the premises for occupancy and the time that the premises is actually occupied by the tenants, which could be years later. Thus, there is no

evidence, only the hearing officer's supposition, that the connected load was in fact 900 kilowatts or greater when the Premises opened for initial occupancy.

4. Finally, we disagree with the conclusion that all the buildings on the Premises constitute one "premises" as defined in the Act. It is undisputed that any one building alone would not meet the 900 kilowatt requirement. The definition of "premises" in the Act allows two or more buildings to be considered a premises provided they are, among other things, utilized by one consumer and are not separately metered. As stated in Division 2, we conclude that these requirements were not met in the instant case.

*Judgment reversed. Banke, P. J., and Birdsong, J., concur in judgment only.*

DECIDED NOVEMBER 19, 1990 —
REHEARING DENIED DECEMBER 5, 1990 — 

*Boyce, Thompson & O'Brien, Peter F. Boyce, Catherine M. Packwood, Hurt, Richardson, Garner, Todd & Cadenhead, Robert J. Middleton, L. Clifford Adams, Jr., Gerald W. Bowling,* for appellant.
*Troutman, Sanders, Lockerman & Ashmore, Robert P. Edwards, Jr., Charles F. Palmer,* for appellee.