S00G0945. SAWNEE ELECTRIC MEMBERSHIP CORPORATION
v. GEORGIA PUBLIC SERVICE COMMISSION et al.
(544 SE2d 158)

THOMPSON, Justice.

We granted a petition for writ of certiorari to the Court of Appeals in *Georgia Public Svc. Comm. v. Sawnee Elec. Membership*

---

*Corp.*, 242 Ga. App. 156 (529 SE2d 186) (2000), to examine the application of OCGA § 46-3-8 (a), the large-load customer choice exception to the Georgia Territorial Electric Service Act, OCGA § 46-3-1 et seq. ("territorial act"). We inquired as follows:

> Did the Court of Appeals err when it found that the Georgia Territorial Electric Service Act's large-load exception applies to an individually-metered apartment complex where the complex's owner installed separate meters that are combined under a master or pass-through meter? See OCGA § 46-3-8 (a); *City of Norcross v. Georgia Power Co.*, 197 Ga. App. 891 (399 SE2d 725) (1990).

The territorial act establishes a plan whereby every geographic area within the state is assigned to an electric supplier. OCGA § 46-3-2. Once a service territory is assigned, an electric supplier "shall have the exclusive right to extend and continue furnishing service to any new premises" within that area. OCGA § 46-3-3 (1). An exception is created by OCGA § 46-3-8 (a), which allows a consumer to choose an electric supplier different from the one assigned, where service is furnished

> to one or more new premises (but if more than one, such premises must be located on the same tract or on contiguous tracts of land), if utilized by one consumer and having single-metered service and a connected load which, at the time of initial full operation of the premises, is 900 kilowatts or greater.

The undisputed facts show that Dominion CTF L.P. ("Dominion") owns and operates a 380-unit apartment complex located within the assigned service territory of the Sawnee Electric Membership Corporation. Nonetheless, Dominion selected and contracted with Georgia Power to supply electric service to the complex, applying the large-load customer choice exception to the territorial act. Pursuant to that contract, Georgia Power installed a master or pass-through meter which measures the electric usage for the entire complex. Georgia Power bills Dominion for the total usage based on the master meter reading. In addition, Dominion installed separate meters in each individual apartment, and it employs an outside company to read the separate meters and bill each tenant for their individual usage.

Sawnee filed a complaint with the Public Service Commission ("PSC"), alleging that Georgia Power is unlawfully supplying electric service to the complex, which is in Sawnee's assigned service area, in violation of the territorial act. Georgia Power responded that it is entitled to provide service to the complex under the large-load excep-

tion. A PSC hearing officer agreed with Sawnee that the arrangement between Dominion and Georgia Power did not meet the large-load exception, but the full PSC found the exception applicable. The superior court reversed on appeal. Both the PSC and Georgia Power filed separate appeals to the Court of Appeals. In a consolidated opinion, the Court of Appeals reversed the trial court and upheld the ruling of the PSC that the complex fell within the exception. *Ga. Public Svc. Comm. v. Sawnee EMC*, supra. Sawnee sought and was granted certiorari in this Court.

The cardinal rule of statutory construction is "first, to ascertain the legislative intent and purpose in enacting the law and then to give it that construction which will effectuate the legislative intent and purpose." (Punctuation omitted.) *City of Calhoun v. North Ga. &c. Corp.*, 233 Ga. 759, 761 (1) (213 SE2d 596) (1975). We also recognize that legislative exceptions in statutes are to be strictly construed and should be applied "only so far as their language fairly warrants." 82 CJS 446, Statutes, § 371. All doubts should be resolved in favor of the general statutory rule, rather than in favor of the exemption. Id. See also *Faust v. Buchanan*, 123 Ga. App. 15, 18 (179 SE2d 294) (1970).

In a statement of legislative intent, the General Assembly declared as its purpose in enacting the territorial act:

(1) to assure the most efficient, economical, and orderly rendering of retail electric service within the state, (2) to inhibit duplication of the lines of electric suppliers, (3) to foster the extension and location of electric supplier lines in the manner most compatible with the preservation and enhancement of the state's physical environment, and (4) to protect and conserve lines lawfully constructed by electric suppliers.

OCGA § 46-3-2.

In *City of Calhoun*, supra at 767, while upholding the constitutionality of the territorial act on several bases, this Court recognized that the legislature "is free to restrict competition among public utilities where . . . such competition may be injurious to existing public service." In that regard, we interpreted the statement of legislative intent embodied in OCGA § 46-3-2 as follows: "the assignment of service areas under the Act restrains competition, the restraint is for the benefit of the public in minimization of duplication of facilities and prevention of their adverse economic and environmental effects." Id. at 768.

In order to determine whether Dominion's complex qualifies for the large-load customer choice exception under OCGA § 46-3-8 (a), we must ascertain whether the complex constitutes one or multiple

"premises," whether the premises is "utilized by one consumer," and whether service is provided to that consumer by means of a "single meter."

The definition of "premises" is contained within the territorial act, as follows:

> "Premises" means the building, structure, or facility to which electricity is being or is to be furnished, provided that two or more buildings, structures, or facilities which are located on one tract or contiguous tracts of land and are utilized by one electric consumer shall together constitute one premises; [but that separate buildings] shall not . . . constitute one premises if the permanent service to it is separately metered and the charges for such service are calculated independently of charges for service to any other building [or] structure. . . .

OCGA § 46-3-3 (6).

Since the electric service to the individual apartments is separately metered and the charges for service to each tenant are calculated independently, the complex cannot be considered "one premises" within the statutory definition.

The word "consumer," however, is not defined in the territorial act. Since it is not a term of art, but is a word of general use, it is to be given its "ordinary and everyday meaning." (Punctuation omitted.) *Risser v. City of Thomasville*, 248 Ga. 866 (286 SE2d 727) (1982). OCGA § 1-3-1 (b). Webster's Third New World Dictionary defines "consumer" as "a person who buys goods or services for personal needs and not for resale or to use in the production of other goods for resale." Similarly, "consumer" is defined by Black's Law Dictionary as individuals "who purchase, use, maintain and dispose of products and services. Users of the final product. . . . A buyer (other than for purposes of resale) of any consumer product."

"[T]he use of plain and unequivocal language in a legislative enactment obviates any necessity for judicial construction, and indeed forbids an interpretation of the meaning of the words employed by the General Assembly." *Board of Tax Assessors &c. v. Catledge*, 173 Ga. 656 (1) (160 SE 909) (1931). Applying the phrase "one consumer" to mean the user of the final product and not a buyer for resale, it is clear that the consumers are the individual tenants whose apartments are separately metered and who are billed for their individual usage.

Guided by the declaration of legislative intent, and giving meaning to the plain language of the statutory exception, we hold that the large-load customer choice exception does not apply to the complex

because the 380 individual tenants, each with separate meters, do not constitute "one consumer" with "single metered service" as contemplated by OCGA § 46-3-8 (a). To rule otherwise would frustrate the legislative intent of the territorial act — "restrain[ing] competition . . . for the benefit of the public in minimization of duplication of facilities and prevention of other adverse economic and environmental effects," *City of Calhoun*,[1] supra at 768, and would extend the exception beyond the plain statutory language.

While the dissent urges that this Court must defer to the PSC's construction of the statute in question, we are not bound to blindly follow such an interpretation and decline to do so here. Administrative rulings are not binding on this Court, and will only be adopted when they conform to the meaning which the appellate court deems should properly be given. *Belton v. Columbus Finance & Thrift Co.*, 127 Ga. App. 770, 772 (195 SE2d 195) (1972). Thus, we are authorized to make an independent determination as to whether the interpretation of the administrative agency correctly reflects the plain language of the statute and comports with the legislative intent. See generally *National Adv. Co. v. Dept. of Transp.*, 149 Ga. App. 334, 339 (254 SE2d 571) (1979) ("even administrative rulings are adopted only after the court has made an independent determination that they correctly reflect the meaning of the statute"). Because we find that the statutory language in this case is unambiguous, we conclude that the PSC exceeded its authority by enlarging the scope of the territorial exception beyond its plain terms. See *North Fulton Medical Ctr. v. Stephenson*, 269 Ga. 540, 543-544 (501 SE2d 798) (1998) ("administrative agencies . . . are not authorized to enlarge the scope of, or supply omissions in, a properly-enacted statute [n]or . . . change a statute by interpretation"). In its interpretation of the large-load exception, the PSC impermissibly applied a strained construction of the statutory language, resulting in a perversion of the legislative intent.

The result reached here is consistent with *City of Norcross v. Georgia Power Co.*, supra, in which the court refused to apply the benefits of the large-load exception to a multi-building office park which had a master meter and individual tenant meters. The court reasoned that the master metering arrangement was a "means to technically confer the benefits of the exception upon a premises that would not otherwise be within the contemplation of the legislature."

---

[1] In *City of Calhoun*, supra at 766, we also noted that application of any provision of the territorial act "in a non-uniform manner [is] prohibited by Art. I, Sec. IV, Par. I of the Georgia Constitution." Therefore, application of the large-load exception in this case where there are multiple consumers, each with single metered service and a connected load of less than 900 kilowatts, could run afoul of the constitution.

Id. at 894. Likewise, we conclude that the exclusive right of an electric service provider to furnish service within its assigned area cannot be intentionally defeated by the installation of a master or pass-through meter and a contract between the owner and the electric supplier which by-passes the individual users of electricity and aggregates 380 separately metered apartments into one premises. A contrary ruling would fly in the face of the obvious intent of the legislature, which was to craft a narrow exception reserved for bona fide large-load consumers.

*Judgment reversed. All the Justices concur, except Hunstein, Carley and Hines, JJ., who dissent.*

HUNSTEIN, Justice, dissenting.

This Court has long recognized that great deference should be given to the interpretation of a statute by the administrative agency charged with enforcing and administrating the statute and that where the provisions of a statute are ambiguous or doubtful, the administrative agency's "contemporaneous practical construction . . . will not be disturbed except for weighty reasons. [Cits.]" *State of Ga. v. Camp*, 189 Ga. 209, 210 (1) (6 SE2d 299) (1939). See also *Kelly v. Lloyd's of London*, 255 Ga. 291, 293 (336 SE2d 772) (1985). This rule is applicable to the Public Service Commission's interpretation of provisions in the Georgia Territorial Electric Service Act. E.g., *City of LaGrange v. Ga. Power Co.*, 185 Ga. App. 60, 63 (363 SE2d 286) (1987), holding that

> the PSC, as the agency charged with . . . the enforcement and administration of the Georgia Territorial Electric Service Act, is entitled to great deference in its interpretation of the Act. The administrative interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight.

(Citations and punctuation omitted.) See also *Colquitt EMC v. City of Moultrie*, 197 Ga. App. 794, 796 (399 SE2d 497) (1990); *North Ga. EMC v. City of Calhoun*, 195 Ga. App. 382, 384 (393 SE2d 510) (1990). Because the majority fails to give any deference to the PSC's interpretation of the ambiguous language in the large-load exception provision of the GTESA and provides no "weighty reason" for substituting its opinion for the reasoned expertise of the PSC, I must respectfully dissent.

The issue in this case turns on the definition to be given the term "one consumer," as used in the large-load customer choice exception set forth in OCGA § 46-3-8 (a) of the Georgia Territorial Electric Service Act. The PSC, in the exercise of its regulatory duties, addressed

the question whether "one consumer" means the ultimate end user of the electricity or the entity with the direct contractual relationship with the electric supplier. After reviewing the evidence adduced before the hearing officer and entertaining oral argument in the course of a full commission review of this issue, the PSC held that because the GTESA is intended to regulate the provision of electric service by the many electric power suppliers within the State, OCGA § 46-3-2, the definition which best comports with the Act as a whole is that "one consumer" means the entity which has the direct relationship with the electric supplier. The record further reflects that the PSC took uniformity of application of the GTESA into consideration in ruling on the issue, after noting that residential customers are the only customer clients in this State who have not had the opportunity to benefit from the lower cost of large-load rates and that the Act expressly prohibits discrimination between classes of consumers, OCGA § 46-3-11 (a), thereby prohibiting any distinctions between the treatment of residential and commercial customers.

The majority refuses to accord any deference to the PSC's expertise in the construction of this term, justifying its decision on the basis that "one consumer" is "plain and unambiguous," despite the testimony presented before the PSC hearing officer, the arguments adduced on the issue, and the diametrically opposite opinions rendered by the PSC and the Court of Appeals on one hand and the superior court and the majority on the other. Given the complex regulatory world of the GTESA, I cannot agree with the majority that no ambiguities exist in defining "one electric consumer." The majority's own construction demonstrates the term's ambiguity. The majority concludes that "one consumer" means the "user of the final product," but at what point is usage determined? The majority notes that Dominion's tenants were separately billed and their apartments submetered, but what if Dominion had chosen to provide electricity at a flat rate directly to the individual apartments? The tenants would still be the ones using the electricity, so would they not still be the "users of the final product"? What if the end user is not a tenant but a customer at a laundromat or a video game player at a pinball arcade? The ambiguity in "one consumer" is created by the number of choices available when determining where, along the continuum of usage, the consumption of electricity occurs.

The PSC considered the ambiguities in "one consumer" and construed the term to mean that the "user of the final product" is the user with the final direct contractual relationship with the electric power server. The PSC's clean, bright-line definition is entitled to this Court's deference and furthermore represents a sensible and practical interpretation of this difficult term. The majority's interpretation totally ignores the contractual relationship an electric service

provider has with its customer, although that is the relationship which is regulated by the GTESA, and focuses on the unregulated relationship the customer may choose to enter into with third parties. By expanding the definition of "one consumer," the majority has in effect improperly imposed a judicially-created on-going obligation on electric service providers to ascertain what their customers are doing with the electric services provided.[2]

The PSC construed "one consumer" in light of its expert knowledge of the manner in which electric service providers contract with customers, the customary usage with meter configurations, and the practical consequences of its interpretation. Thus, the PSC's interpretation, unlike the majority's, inflicts no adverse consequences upon the common use of master meter configurations in commercial settings[3] and serves the non-discrimination policy of the GTESA by allowing multi-family residential customers to take advantage of the lower rates available under the large-load exception. The PSC has acted in a manner which best promotes the GTESA's legislative goal of "assur[ing] the most efficient, economical, and orderly rendering of retail electric service within the state." OCGA § 46-3-2.

Our case law requires that we have "weighty reasons" before we disturb an administrative agency's practical construction of ambiguous language in a statute it enforces. *State of Ga. v. Camp*, supra, 189 Ga. at 210 (1). The majority can produce no "weighty reasons" for a construction of OCGA § 46-3-8 (a) which ignores the functional application of the large-load exception, gives no deference to the expertise the PSC has gained by virtue of its regulatory and administrative duties over the electric power industry, promotes adverse consequences and undermines the legislative goals of the GTESA as set forth in OCGA § 46-3-2.[4] Accordingly, because there are no reasons,

---

[2] Thus, an electric service provider would be required to ferret out changes in its customers' operations so as to determine, for example, whether a grocery store customer, which decided to allow a bank branch or a fast food outlet to operate under its single meter, has invalidated the large-load exception under which electric service is provided to the store.

[3] Expert testimony was adduced that military bases such as Fort Benning, shopping malls like Perimeter Mall, and commercial enterprises like the Galleria complex have a master meter configuration, whereby electricity is received at a master meter with submeters for individual stores or offices within the building or complex. A Georgia Power Company account executive for multi-family markets noted that there are other electric companies providing service to master-meter configured complexes within Georgia Power's territory under the large-load exception.

[4] In addition to generic dictionary definitions, the majority cites as support of its holding the "consistent" one-judge opinion rendered in *City of Norcross v. Ga. Power Co.*, 197 Ga. App. 891 (399 SE2d 725) (1990). That case, however, is not only distinguishable on its facts (given the absence of any evidence that Dominion's tenants possess any purchase options in the apartments they rent), but contains the express recognition that the "one consumer" requirement "could well apply" in factual situations involving a "multi-tenant office building that is conceived, used and will continue to be used as a unified rental premises, owned and

weighty or otherwise, to justify this Court's refusal to accord deference to the PSC's ruling, I dissent to the reversal of the well-reasoned opinion by the Court of Appeals upholding the PSC and applying the correct interpretation of OCGA § 46-3-8 (a).

I am authorized to state that Justice Carley and Justice Hines join in this dissent.

DECIDED MARCH 19, 2001 —
RECONSIDERATION DENIED APRIL 12, 2001.

*Sutherland, Asbill & Brennan, James A. Orr, Charles B. Jones III*, for appellant.

*Troutman Sanders, Kevin C. Greene, Helen O'Leary, James S. Hurt, Thurbert E. Baker, Attorney General, Robert S. Bomar, Deputy Attorney General, Harold D. Melton, Senior Assistant Attorney General, Daniel S. Walsh, Assistant Attorney General*, for appellees.

*Alston & Bird, L. Clifford Adams, Jr., Peter M. Degnan, Robert J. Middleton, Jr., Tisinger, Tisinger, Vance & Greer, Richard G. Tisinger, Sr., Steven T. Minor*, amici curiae.

---

operated by one entity." Id. at 894 (2). Since this case before us now involves multi-tenant residential buildings that were conceived, are used and will continue to be used as a unified rental premises, owned and operated by one entity, the majority's result hardly qualifies as "consistent" with the *City of Norcross* opinion.