A08A1646. CITY OF LAGRANGE v. GEORGIA PUBLIC SERVICE COMMISSION.

(675 SE2d 525)

MIKELL, Judge.

The City of LaGrange (the "City") filed a petition against Diverse Power Incorporated ("DPI") with the Georgia Public Service Commission (the "Commission"), alleging a violation of the Georgia Territorial Electric Service Act (the "Act"), codified at OCGA § 46-3-1 et seq. "The [Act] establishes a plan whereby every geo-

---

graphic area within the state is assigned to an electric supplier."[1] "Once a service territory is assigned, an electric supplier shall have the exclusive right to extend and continue furnishing service to any new premises within that area."[2] In its petition, the City alleged that pursuant to the Act, DPI was not authorized to provide electric service to the Troup County High School ball field or the newly constructed Fine Arts Auditorium (the "Auditorium") because both properties were within the City's exclusive service territory.

A hearing was held, and the hearing officer assigned to the matter by the Commission issued findings of fact and conclusions of law in an Initial Decision. The hearing officer concluded that DPI was authorized to provide electricity to the Auditorium as well as to the ball field. The City filed an application for review of the Initial Decision with the Commission, and the Commission approved and adopted the Initial Decision. The City then filed its petition seeking judicial review of the Commission's decision in the Superior Court of Fulton County, which affirmed the decision of the Commission. On appeal, the City challenges the trial court's order. We affirm.

> When this Court reviews a superior court's order in an administrative proceeding, our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency. We will affirm if "any evidence" on the record substantiates the administrative agency's findings of fact and conclusions of law.[3]

We give

> deference to the factual findings of the agency . . . [and we] may reject those findings only if they are clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.[4]

"Neither our review nor the trial court's review of the [Commis-

---

[1] *Sawnee Elec. Membership Corp. v. Ga. Public Svc. Comm.*, 273 Ga. 702, 703 (544 SE2d 158) (2001); *Jackson Elec. Membership Corp. v. Ga. Public Svc. Comm.*, 294 Ga. App. 253, 255, n. 1 (668 SE2d 867) (2008). See OCGA § 46-3-2.

[2] (Punctuation omitted.) *Sawnee Elec. Membership Corp.*, supra, citing OCGA § 46-3-3 (1).

[3] (Citations and punctuation omitted.) *Unified Govt. of Athens-Clarke County v. Ga. Public Svc. Comm.*, 293 Ga. App. 786 (668 SE2d 296) (2008).

[4] (Citations and punctuation omitted.) *Douglas Asphalt Co. v. Ga. Public Svc. Comm.*, 263 Ga. App. 711, 712 (2) (589 SE2d 292) (2003).

YALE LAW LIBRARY

sion]'s decision is de novo."[5]

It is undisputed that pursuant to the Act, the City has provided electrical service to Troup County High School (the "School") since its construction in 1987. Patrick Bowie, who serves as the director of utilities for the City, testified that since the initial construction of the School, the City had installed additional metering points to service the School. The original meter recorded electric use by the School. Another meter was installed to service the scoreboard in 1989. The City installed a third meter to supply service to a trailer, the rates for which were calculated independently of the rates for the main School building. Bowie testified that another meter was installed to service the baseball pitching machines in 1990.

Bowie testified that the City received notice that the Auditorium was going to be built when it was invited to respond to a request for proposal ("RFP") to provide electrical service to the Auditorium during the summer of 2002. Bowie also testified that the City learned about the construction of a field house at around the same time but that the electrical service to the field house was not included in the RFP. Bowie further testified that he contacted Frank Gurley, the assistant superintendent for the Troup County school system, to inform him that the City's position was that the Auditorium was an expansion of the School and consequently, the City had the right to provide electric service to the Auditorium and that the City would not be responding to the RFP. In the meantime, the City extended a single phase electric tap and installed a meter so that the contractor could begin the project and consolidated the accounts for the various meters at the School onto one bill.

Bowie then sent a letter to Gurley in response to the RFP informing him of the single tap and outlining its intentions to meet the criteria included in the RFP. In a separate letter, Bowie explained that in spite of the City's position that it, alone, had the exclusive right to serve the Auditorium, it would match the rate offered by DPI, which had responded to the RFP. A few weeks later, Bowie learned that the Troup County Board of Education (the "Board") had awarded the contract to DPI. In response thereto, the City filed its complaint with the Commission.

Gurley testified that both the Auditorium and the athletic field house were funded by a special purpose local option sales tax. The buildings were constructed on the same property as the School, and all three buildings shared a common driveway and parking. Gurley explained that the students and teachers at the School used the Auditorium but that it was also available for use to outside groups

---

[5] Id.

YALE LAW LIBRARY

for a fee. Regarding the costs to operate the Auditorium, Gurley stated that the operation and maintenance costs for the Auditorium were paid out of the School budget but that the janitor's salaries and the utilities were paid out of the county system budget.

Wayne Livingston, the president and CEO of DPI, explained DPI's involvement in this matter. Livingston testified that DPI began servicing the ball field lights at the School in 1996 after it received two RFPs from the Board in 1995 concerning several other schools, Calloway High and Middle and Long Cane Middle Schools. Included in DPI's response to the RFPs was an offer to donate ball field lights to Calloway High School. After DPI was awarded both contracts, the Board asked DPI to donate the ball field lights to Troup County High School instead of Calloway. Livingston testified that he knew that DPI had no territorial rights to provide service to the ball field lights, but he informed the Board that DPI would donate the lights if the City would allow DPI to install the lights and provide the electricity to the lights. Livingston maintained that DPI would not donate the lights without that agreement with the City because the lights were expensive.

Livingston recalled that he talked to Bowie about DPI servicing the ball field and that Bowie agreed that DPI could do so. Before installing the lights, DPI faxed the City a utility locate request on or about February 15, 1996, which indicated that it planned to bury a 2,000-foot underground power cable in an area on the property. Bowie testified that the City responded to the locate request and should have sent employees to locate all of the underground facilities owned by the City in that area. Livingston testified that he did not learn that the power from the transformer installed to service the ball field lights had been extended to service the concession stand and scoreboard at the ball field until he was preparing for this litigation. Because DPI had no right to provide electricity to these areas, DPI offered to transfer the service to both to the City.

George Coggin, DPI's safety coordinator, testified that his responsibilities at DPI included test and investigation, power heft and diversion, and various other types of loss control. Coggin testified that he had measured the distances between various points on the property and concluded that the School and the Auditorium were 176 feet apart at their closest points; that the distance between the City's meter and DPI's transformer was 213 feet; that a person would drive by DPI's transformer to reach the City's meter; and that the distance between the closest ball field light and the City's meter was 109 feet. Coggin also testified that the equipment installed by DPI at the School included 2,000 feet of underground primary cable, one cabinet, a terminating cabinet, a pad-mount transformer serving the ball field and another run of underground cables and a transformer

that served the Auditorium as well as an overhead line to the front of the property; and that the cost to install the poles and lights was approximately $25,000 in addition to the equipment cost of $10,000. Coggin stated that DPI currently services the Auditorium and bills the Board for that service.

1. In its first enumerated error, the City argues that the Auditorium was an expansion of the premises; thus, it remains within the exclusive service territory of the City and could not be served by DPI. "Under the APA, the Commission is the finder of fact and weighs the credibility of the evidence. The court in reviewing administrative decisions shall not substitute its judgment for that of the board if there is any evidence to support its findings."[6] Because the evidence supports the Commission's findings, this enumerated error fails.

> [T]he [Commission], as the agency charged with oversight and supervision of electric power companies in this State, OCGA [§] 46-2-20 (a), including the enforcement and administration of the . . . Act, is entitled to great deference in its interpretation of the Act. The administrative interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight.[7]

The Commission relies on OCGA § 46-3-8 (a) in support of its decision, which allows a consumer to choose an electric supplier different from the assigned supplier where service is furnished to one or more new premises. However, the City contends that this case falls within the "grandfather clause" set forth in OCGA § 46-3-8 (b), which provides, in pertinent part, that "every electric supplier shall have the exclusive right to continue serving any premises lawfully served by it." The Commission concluded that OCGA § 46-3-8 (b) had no applicability because the City did not prove that the Auditorium was an expansion of the School. We agree.

In reaching its conclusion that the Auditorium was not an expansion, the Commission correctly considered the definition of "premises" as defined in OCGA § 46-3-3 (6).[8] The statute provides

---

[6] (Punctuation omitted.) *Ga. Public Svc. Comm. v. Southern Bell*, 254 Ga. 244, 246 (327 SE2d 726) (1985), citing *Lasseter v. Ga. Public Svc. Comm.*, 253 Ga. 227, 231 (3) (319 SE2d 824) (1984).

[7] (Citation and punctuation omitted.) *City of LaGrange v. Ga. Power Co.*, 185 Ga. App. 60, 63 (363 SE2d 286) (1987) (whole court). See also *Colquitt Elec. Membership Corp. v. City of Moultrie*, 197 Ga. App. 794, 796 (399 SE2d 497) (1990).

[8] See *Colquitt Elec. Membership Corp.*, supra (we must first consider OCGA § 46-3-3 in

that

> "[p]remises" means the building, structure, or facility to which electricity is being or is to be furnished, provided that two or more buildings, structures, or facilities which are located on one tract or contiguous tracts of land and are utilized by one electric consumer shall together constitute one premises; provided, however, that any such building, structure, or facility shall not, together with any other building, structure, or facility, constitute one premises if the permanent service to it is separately metered and the charges for such service are calculated independently of charges for service to any other building, structure, or facility.

The Commission found that the School and Auditorium are facilities that are not connected and are physically separate and apart from one another; that teachers and students from the School will use the Auditorium but that it would be available for use to outside groups for a usage fee; that the Auditorium is separately metered from the School;[9] that the electric utility bill for the School is paid by the principal while the Auditorium bill is paid by the Board; that the City had separate utility accounts and meters for each building on the premises and only moved to consolidate them when this litigation was imminent; and that Bowie could not give a plausible explanation for how the facilities could properly be billed through a single master meter when the City agreed to match the competitive rate offered by DPI for the Auditorium while maintaining the existing rate for the School.[10] The City argues at length that various findings of fact of the Commission were either erroneous or reflected a misunderstanding or misinterpretation of the testimony, or both. But we remind the City that the Commission is the finder of fact and weighs the credibility of the evidence, not this Court,[11] and that we will affirm if there is "any evidence" of record that substantiates the Commission's findings of fact and conclusions of law.[12] We find that the Commission's findings and conclusions are supported by the evidence in the record and are not contrary to or in excess of the

---

reviewing the Commission's conclusion that a building is or is not an expansion of the premises).

[9] The hearing officer noted that this factor was not controlling and could not be weighted against the City because DPI had been awarded the contract.

[10] When asked how the City planned to provide electric service under a single master meter, Bowie was unable to provide a specific answer but stated that it would be negotiated.

[11] See *Southern Bell*, supra.

[12] See *Unified Govt. of Athens-Clarke County*, supra.

Commission's statutory authority. Furthermore, we do not find that the Commission's decision was arbitrary or capricious or that it constituted an abuse of discretion. Accordingly, the trial court did not err in affirming the Commission's decision.

2. The City argues that the Commission erred in determining that DPI could continue to service the ball field lights because DPI did not comply with the requirements of OCGA § 46-3-8 (c) (2). OCGA § 46-3-8 (c) (2) provides as follows:

> Upon the joint application of the affected electric suppliers, the commission shall have the authority and jurisdiction, after notice to all affected persons and after hearing, if a hearing is requested, to find and determine that the public convenience and necessity require, and thereupon to approve, the transfer of service from one electric supplier to another electric supplier.

We agree with the Commission's finding that, on its face, this statute pertains to the transfer of service as opposed to the continuation of service.

We must follow the plain meaning of the statutory language,[13] and absent evidence to the contrary, "words should be assigned their ordinary, logical, and common meaning."[14] "In interpreting OCGA § 46-3-8, [we must] consider the subsections in pari materia, and . . . reconcile them, if possible, so that they may be read as consistent and harmonious with one another."[15] Both subsections (c) (1) and (c) (2) provide the manner through which service can be transferred. In the former, service can be transferred if the current service is inadequate or undependable or the rates charged therefor or rules governing same are unreasonable, and in the latter, service can be transferred out of public convenience and necessity. Having construed OCGA § 46-3-8 (c) in this manner, we find no merit to the City's argument that this statute precludes DPI's continued service to the ball field lights.

The City's remaining arguments are premised upon a challenge to the credibility of the testimony of Livingston as opposed to that of other witnesses, as well as disagreements with the Commission's or hearing officer's factual findings. The City urges that Livingston's testimony that DPI reached an agreement with the City whereby it

---

[13] *Columbus, Ga. Consolidated Govt. v. Schmidt*, 269 Ga. 723, 723-724 (507 SE2d 435) (1998).

[14] (Citation and punctuation omitted.) *Pine Pointe Housing v. Bd. of Tax Assessors of Lowndes County*, 269 Ga. App. 855, 858 (1), n. 9 (605 SE2d 443) (2004) (whole court).

[15] (Citation omitted.) *City of LaGrange*, supra at 62.

was allowed to donate the electrical poles and service the ball field lights should not be believed in light of Bowie's testimony that he had no recollection of such an agreement. As stated earlier, the Commission weighs the credibility of the evidence.[16] Livingston testified that there was an agreement and that DPI would not have donated $8,000-$10,000 worth of equipment if it had not been allowed to provide the service. The hearing officer found credible Livingston's testimony that a verbal agreement existed to serve only the ball field lights, particularly in light of Livingston's concession that DPI had no right to service the concession stand and scoreboard and DPI's offer to transfer that service to the City. Therefore, there was evidence to support the Commission's conclusion that DPI was entitled to provide service for the ball field lights.

*Judgment affirmed. Miller, C. J., and Blackburn, P. J., concur.*

DECIDED MARCH 13, 2009.

*Friedman, Dever & Merlin, Genevieve H. Dame,* for appellant.
*Thurbert E. Baker, Attorney General, Isaac Byrd, Deputy Attorney General, Sidney R. Barrett, Senior Assistant Attorney General, Daniel S. Walsh, Assistant Attorney General, Sutherland, James A. Orr, Jennifer N. Ide,* for appellee.

---

[16] *Ga. Public Svc. Comm. v. Alltel Ga. Communications Corp.,* 244 Ga. App. 645, 647 (536 SE2d 542) (2000).