**THIRD DIVISION
DOYLE, P. J.,
GOBEIL, J., and SENIOR JUDGE FULLER**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**March 13, 2024**

# In the Court of Appeals of Georgia

A23A1381. SAWNEE ELECTRIC MEMBERSHIP CORPORATION v. GEORGIA PUBLIC SERVICE COMMISSION.

DOYLE, Presiding Judge.

This appeal arises out of the superior court's denial of Sawnee Electric Membership Corporation's ("SEMC") petition for judicial review seeking to reverse the Georgia Public Service Commission's ("PSC") decision that Georgia Power Company ("Georgia Power") was authorized to provide retail electric service to an electric vehicle ("EV") charging station located in a geographic area exclusively assigned to SEMC under the Georgia Territorial Electric Service Act (the "Act").[1] Based on the record before us, we find no error and affirm.

---

[1] See OCGA § 46-3-1 et seq.

The underlying facts are undisputed and are set out in detail in the Hearing Officer's Decision. Electrify America LLC ("Electrify America") issued a request for proposal ("RFP") seeking a provider of retail electric service to a new EV charging station consisting of six power stations and four EV chargers in Suwanee, Georgia, (the "premises") in the geographical area assigned to SEMC, pursuant to the Act. The RFP sought electrical service for approximately 1,000 kW of connected load at the premises through four charging ports, two of which have a 150 kW rating and the other two, a 350 kW rating. The chargers are connected to six power cabinets, each with a nameplate rating of 190 kW, for a total nameplate rating of 1,140 kW. Both Georgia Power and SEMC submitted bids in response to the RFP, and Electrify America selected Georgia Power to service the premises.

Georgia Power provided retail electric service to the premises through a single meter in the form of alternating current ("AC") power. Each of the four charging ports includes a rectifier, which is a specialized piece of equipment that converts the AC power to direct current ("DC") power. EVs have lithium batteries, which can only be charged with DC power. Electrify America pays Georgia Power for the AC electric service it provides and bills the EV owners for the DC power the chargers

produce on a per-minute basis. Georgia Power has no contractual relationship with the EV owners who use the premises.

In May 2021, SEMC filed its original petition with the PSC, alleging that Georgia Power had violated the Act by supplying power to the premises, and Georgia Power countered that it was authorized to serve the premises under the Act's large load exception.[2] The large load exception allows a retail electric customer at a new premises located outside municipal limits to choose its electrical supplier if the premises is "utilized by one consumer and [has] single-metered service and a connected load which, at the time of initial full operation of the premises, is 900 [kW] or greater (excluding redundant equipment)."[3] Georgia Power asserted that the premises is located outside the limits of the municipality, that it served one consumer with a single meter, and that the premises had a connected load at the time of initial operation of 900 kW or greater. The matter was assigned to a hearing officer, and Tesla, Inc., ("Tesla") and Electrify America intervened in the proceedings.

---

[2] See OCGA § 46-3-8 (a).

[3] OCGA § 46-3-8 (a).

After conducting an evidentiary hearing, the hearing officer issued the PSC's Initial Decision, which denied SEMC's petition. SEMC applied for full PSC review, and the PSC affirmed and adopted the Initial Decision. SEMC then filed its petition for judicial review in Fulton County Superior Court, arguing that the PSC had erroneously interpreted the Act, and the superior court affirmed the PSC's decision that the large load exception applied. This appeal followed, in which SEMC argues that the superior court's order must be reversed. For the reasons discussed below, we affirm the trial court.

"Generally speaking, the interpretation of statutes, ordinances, and charters presents a question of law for the court and is subject to de novo review on appeal."[4] Nonetheless,

> [w]hen an administrative agency decision is the subject of judicial review, judicial deference is to be afforded the agency's interpretation of statutes it is charged with enforcing or administering and the agency's interpretation of rules and regulations it has enacted to fulfill the function given it by the legislative branch. Judicial review of an administrative decision requires the court to determine that the [agency's] findings of fact are supported by "any evidence" and to

---

[4] (Punctuation and footnote omitted.) *Infinite Energy v. Marietta Natural Gas*, 349 Ga. App. 343, 344 (826 SE2d 189) (2019).

4

examine the soundness of the conclusions of law that are based upon the findings of fact. A reviewing court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Our duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency. Moreover, the superior courts cannot substitute their judgment for that of the hearing officer as to the weight of the evidence on questions of fact.[5]

We also point out, however, that

[e]ven though we generally apply "great deference" to the PSC's interpretation of an act, if a case does not involve interpretation of a technical question necessary to the administration of a law and simply requires a judicial determination as to whether the PSC correctly interpreted the plain meaning of the statute, then we are authorized to make an independent determination as to whether the interpretation of the administrative agency correctly reflects the plain language of the statute and comports with the legislative intent.[6]

---

[5] (Citation and punctuation omitted.) *Central Ga. Elec. Membership Corp. v. Ga. Public Svc. Comm.*, 351 Ga. App. 69, 71 (830 SE2d 459) (2019).

[6] (Punctuation and footnotes omitted). *Infinite Energy*, 349 Ga. App. at 345.

When considering an agency's conclusions of law, "courts conduct a de novo review."[7] Under OCGA § 50-13-19 (h), a superior court may reverse an agency decision if its administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

SEMC asserts that the superior court's order must be reversed in accordance with OCGA § 50-13-19 (h) (2), (5), and (6) and because it violates the Act.

We begin with the cardinal rule of statutory construction, which requires that we first "ascertain the legislative intent and purpose in enacting the law and then to

---

[7] Id. at 344.

give it that construction which will effectuate the legislative intent and purpose."[8] We are cognizant that "legislative exceptions in statutes are to be strictly construed and should be applied only so far as their language fairly warrants [and that] [a]ll doubts should be resolved in favor of the general statutory rule, rather than in favor of the exemption."[9]

As a matter of statutory context, OCGA § 46-3-2 sets forth the legislative intent of the Act:

> (1) to assure the most efficient, economical, and orderly rendering of retail electric service within the state, (2) to inhibit duplication of the lines of electric suppliers, (3) to foster the extension and location of electric supplier lines in the manner most compatible with the preservation and enhancement of the state's physical environment, and (4) to protect and conserve lines lawfully constructed by electric suppliers.[10]

---

[8] (Citation omitted). *Sawnee Elec. Membership Corp. v. Ga. Pub. Svc. Comm.*, 273 Ga. 702, 704 (544 SE2d 158) (2001) ("*Sawnee EMC*").

[9] (Citation omitted). Id.

[10] OCGA § 46-3-2.

In order to effectuate that purpose, the text of the Act assigns each geographic area to an electric supplier but also includes the large load exception to allow customers to choose their electric supplier if certain conditions exist. The applicability of the Act's large load exception to EV charging stations was a matter of first impression for the PSC. The premise of SEMC's appeal is that the PSC erroneously interpreted the terms "consumer" and "connected load," as they appear in the exception.

1. We first address SEMC's argument that the PSC erred by ruling that the EV charging station is utilized by one "consumer."

As noted above, in order for an electric service provider to proceed with service under the large load exception, the premises must be "utilized by one consumer and have single-metered service."[11] The issue here is whether the EV drivers are the consumers, as SEMC argues, or whether the consumer is the charging station itself.

The Act does not define the word "consumer."[12] SEMC relies on *Sawnee EMC*, in which the Supreme Court construed "consumer" as it relates to the large

---

[11] OCGA § 46-3-8 (a).

[12] See OCGA § 46-3-3.

load exception.[13] In that case, a 380-unit apartment complex asserted that it qualified for the exception and selected Georgia Power to supply electric service to the complex. Georgia Power installed a master or pass-through meter to measure the electric service provided to the complex.[14] The complex installed separate meters in each apartment and employed an outside service to read each meter and bill each tenant for their electricity usage.[15] Sawnee EMC filed a complaint with the PSC, alleging that Georgia Power was unlawfully supplying electric service to the complex, the PSC agreed with Georgia Power that the large load exception applied and, the trial court reversed the PSC.[16]

On appeal, the Supreme Court explained that because

[consumer] is not a term of art, but is a word of general use, it is to be given its "ordinary and everyday meaning." Webster's Third New World Dictionary defines consumer as "a person who buys goods or

---

[13] 273 Ga. at 705.

[14] Id. at 703.

[15] Id.

[16] Id. at 704. Both the PSC and Georgia Power filed appeals in this Court, and we reversed the trial court and upheld the ruling of the PSC that the complex fell within the exception. *Ga. Pub. Svc. Comm. v. Sawnee Elec. Membership Corp.*, 242 Ga. App. 156 (529 SE2d 186) (2000), reversed by *Sawnee EMC*, 273 Ga. at 707.

services for personal needs and not for resale or to use in the production of other goods for resale." Similarly, "consumer" is defined by Black's Law Dictionary as individuals "who purchase, use, maintain and dispose of products and services. Users of the final product. . . . A buyer (other than for purposes of resale) of any consumer product.'"[17]

The Supreme Court concluded that "the consumers [were] the individual tenants whose apartments are separately metered and who are billed for their individual usage" and held that "the large-load customer choice exception [did] not apply to the complex because the 380 individual tenants, each with separate meters, [did] not constitute 'one consumer' with 'single metered service' as contemplated by OCGA § 46-3-8 (a)."[18]

In the instant case, it is undisputed that unlike the apartment complex in *Sawnee EMC*, the premises has a single meter, not a master meter or a pass-through meter. Applying *Sawnee EMC*, we look to the user of the final product to identify the consumer. There was testimony that the final product provided by Georgia Power was AC power that was paid for by Electrify America, not the EV owners, and Electrify

---

[17] (Citations and punctuation omitted). *Sawnee EMC*, 273 Ga. at 705.

[18] Id. at 705-706.

America did not resell the *AC power* provided by Georgia Power to the EV owners. The evidence was undisputed that AC power cannot be utilized to charge an EV's lithium battery. Rather, the rectifiers in the charging stations convert the AC power to DC power in order to charge the lithium car batteries, and there was testimony that the sale of DC fast charging services between a charging operator like Electrify America or Tesla and that of an EV owner does not constitute a retail sale of electricity. Tesla's witness testified that retail electric service is where the electric supplier delivers electricity to the customer of record, in this case, Electrify America, at the electric supplier's meter. Thus, consistent with the plain meaning of "consumer,"[19] the record supports the PSC's conclusion that Electrify America is the sole "consumer" of retail AC power at its EV charging stations.

2. Next, SEMC argues that the PSC erred by ruling that the premises satisfied the large load exception requirement that it have a connected load of 900 kW or greater.[20] Specifically, SEMC maintains that the connected load is based on load-consuming equipment, and because rectifiers, although connected to the charging

---

[19] See *Sawnee EMC*, 273 Ga. at 706 (explaining that courts are not bound by administrative rulings that do not comport with "the plain language of the statute").

[20] See OCGA § 46-3-8 (a).

11

stations, do not consume load by themselves, they should not have been counted toward the 900 kW connected load requirement. Again, we find there was evidence in support of the PSC's conclusion.

It is undisputed that the Territorial Act does not define "connected load."[21] The PSC noted that no previous case in Georgia has addressed whether a rectifier constitutes connected load. There was expert testimony that "connected load" is a term of art, and as a term of art, it is not necessarily afforded a literal, plain meaning and must be construed, generally, to be used in reference to the meaning ascribed by the PSC in the context of a regulatory statute it is charged with administering.[22] Consequently, we apply deference to the PSC's interpretation of the term.[23]

---

[21] See generally OCGA § 46-3-3.

[22] See *Cooper/T. Smith Stevedoring Co. v. State of Ga.*, 317 Ga. App. 362, 370 (4) (730 SE2d 168) (2012) ("Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning."). See also OCGA § 1-3-1 ("In all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter, which shall have the signification attached to them by experts in such trade or with reference to such subject matter.").

[23] Cf. *Sumter Elec. Membership Corp. v. Ga. Power Co.*, 286 Ga. 605, 607 (690 SE2d 607) (2010).

12

The PSC determined that connected load included the nameplate ratings of the hard-wired equipment connected to the premises, including the rectifiers. Georgia Power, Tesla, and Electrify America all offered testimony that the power cabinets and charging apparatus, including the rectifiers, are hard wired, have collective nameplate ratings that exceed 900 kW, and are a vital, necessary part of the initial full operation of the premises. Georgia Power's expert explained that because

> the actual load carried by a given item of equipment. . . is unknown, the manufacturer's nameplate data, which lists the rated horsepower or input current and voltage, is used to determine the connected load for [the] equipment. Therefore, it is appropriate to use the nameplate capacity in determining the connected load for purposes of the Territorial Act large load exception. This approach has been well accepted by [PSC] for the determination of connected load.

Additionally, he testified that it was appropriate to use connected load rather than metered demand, as proffered by SEMC's witnesses, for customer choice exceptions because the Act specifically uses the term "connected load" and utilities must make decisions regarding a customer's qualification for the exception long before the actual facility is constructed, and unlike connected load, metered demand is not known pre-construction. The expert also physically inspected the premises and opined that the

connected load of the premises included the rectifiers and exceeded 900 kW. Electrify America's witness testified that the company has repeatedly used actual maximum connected load, which was 1,140 kW based on the nameplate reading of the power cabinets, as determinative of eligibility under the Act's large load exception.

SEMC presented evidence to the contrary that the rectifiers are passive devices that only modify energy rather than consuming it, and, therefore, should not be counted as a part of the connected load. Additionally, it argued that the actual connected load included only a small amount of auxiliary power needed to operate the LCD panels on the chargers and other equipment, which is substantially below 900 kW, as the chargers only draw power when a vehicle owner uses one to charge an EV. This interpretation is overly constrained, however, because it ignores the rectifier's actual power draw while in operation, and the PSC rejected SEMC's position, which it was authorized to do. "[T]he [PSC] is the finder of fact and weighs the credibility of the evidence[.]"[24]

To the extent that the issue before us involves a technical, factual determination regarding the status of rectifiers, we have held that "[t]he presence of conflicting

---

[24] (Citation omitted). *Excelsior Elec. Membership Corp. v. Ga. Pub. Svc. Comm.*, 322 Ga. App. 687, 691 (745 SE2d 870) (2013).

evidence, including dueling experts, . . . satisf[ies] the any evidence standard."[25] Again, it is our role to determine if the findings of fact are supported by any evidence, and then to examine the soundness of the conclusions of law based upon the findings of fact.[26] Here, the evidence supported the PSC's finding that the combined nameplate ratings of the power cabinets and hard-wired rectifiers met the 900 kW threshold for the large load exception. There was testimony that this manner of determining connected load — a term of art — has been the PSC's accepted practice over the years. Thus, we defer to the PSC's established determination of connected load as the agency charged with enforcing and administering the Act.[27] The PSC's conclusion that Electrify America was authorized to choose its retail electric service provider under the large load exception of the Territorial Act was supported by the text of the Act and the evidence of record. Consequently, finding no legal error, we affirm the trial court's order.

---

[25] *Ga. Power Co. v. Ga. Pub. Svc. Comm.,* 196 Ga. App. 572, 580 (5) (396 SE2d 562) (1990).

[26] See *Central Ga. Elec. Membership Corp.*, 351 Ga. App. at 71, 72.

[27] See *Infinite Energy*, 349 Ga. App. at 344.

*Judgment affirmed. Senior Judge C. Andrew Fuller concurs. Gobeil, J., concurs in Division 2 and dissents as to Division 1.*

A23A1381. SAWNEE ELECTRIC MEMBERSHIP
CORPORATION v. GEORGIA PUBLIC SERVICE
COMMISSION.

GOBEIL, Judge.

I concur to Division 2, but respectfully dissent to the majority's conclusion in Division 1.

Though closely argued, ultimately I am not persuaded that the record supports the PSC's determination that Electrify America is the "one consumer" for purposes of the Territorial Act's large load exception. First, although the PSC's interpretation of the Act is entitled to great deference, construing the phrase "one consumer" does not "involve interpretation of a technical question necessary to the administration of law. It simply requires a judicial determination as to whether the PSC correctly

interpreted the plain meaning of the statute." *Sumter Elec. Membership Corp. v. Ga. Power Co.*, 286 Ga. 605, 606 (690 SE2d 607) (2010) (citation omitted). Further, we are required to construe legislative exceptions in statutes – such as the large load exception at issue here – strictly, and resolve all doubts against finding an exemption. *Walton Elec. Membership Corp. v. Ga. Power Co.*, 369 Ga. App. 461, 464 (1) (893 SE2d 852) (2023) (citation and punctuation omitted).

Significantly, the Supreme Court of Georgia already has weighed in on what "consumer" means under the Territorial Act's large load exception. Citing Webster's Third New World Dictionary, the Supreme Court in *Sawnee EMC* stated that "consumer" is defined as "a person who buys goods or services for personal needs and not for resale or to use in the production of other goods for resale."[1] 273 Ga. at 705 (emphasis supplied). Even assuming that the appellees are correct that Electrify America is not reselling the same product (and hence not excluded by the "not for resale" language), I am unconvinced that Electrify America qualifies as the "one consumer" given its use of the electricity for "use in the production of other goods

---

[1] And, the Supreme Court also noted that Black's Law Dictionary defines "consumer" as individuals "who purchase, use, maintain and dispose of products and services. Users of the final product. . . . A buyer (other than for purposes of resale) of any consumer product."

for resale." I recognize that the General Assembly may not have contemplated the unique nature of EV-related services in its 1973 enactment of OCGA § 46-3-8.[2] But, given the law applicable here, I would reverse the trial court's order.

---

[2] In 2023, the General Assembly enacted OCGA § 46-2-20.1, effective July 1, 2023. This statutory provision, which was not in effect during the proceedings underlying this appeal, addresses electric vehicle charging stations and provides that "[t]he supply of electricity by an electric utility . . . to premises that are electric vehicle charging stations shall constitute the furnishing of service under . . . the 'Georgia Territorial Electric Service Act,' and shall be considered a sale at retail within the meaning of [Part 1 of Article 1 of Chapter 8 of Title 48 (Revenue and Taxation)]."