**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)**
**http://www.gaappeals.us/rules/**

**July 9, 2012**

# In the Court of Appeals of Georgia

A12A0760. COOPER/T.SMITH STEVEDORING COMPANY v. STATE OF GEORGIA, BY AND THROUGH IT'S DEPARTMENT OF ADMINISTRATIVE SERVICES et al.

BOGGS, Judge.

This is the second appearance of this case before this court. The operative facts are recited in *Cooper/T. Smith Stevedoring Co. v. Georgia Ports Auth.*, 301 Ga. App. 62 (686 SE2d 844) (2009) (hereinafter "*CTS I*"):

> This is a breach of contract action brought by the Georgia Ports Authority [("the GPA") and The Georgia Department of Administrative Services ("DAS")] against Cooper/T. Smith Stevedoring Company, Inc. ["CTS"] and Cooper/T. Smith Corporation[1] . . . to enforce a contract by which [the] GPA leased a gantry crane to CTS to discharge cargo from a ship berthed at the GPA's Ocean Terminal located in Savannah in

---

[1] Cooper/T. Smith Stevedoring Corporation was later dismissed from the lawsuit without predjudice.

Chatham County. The contract terms are set forth in a document known as GPA Terminal Tariff No. 5 ["the Tariff"], which provided the rates, rules, and regulations governing various services at the Ocean Terminal, including the GPA's lease of cranes to stevedoring companies for discharge of cargo from ships. It is undisputed that, while CTS was using the crane, it fell over and was destroyed during an attempt to lift cargo from the ship.[2] The GPA and the DAS sued CTS in the Fulton County Superior Court to enforce contract terms which allegedly made CTS liable for the destruction of the crane and for the cost of replacement. CTS appeals from the superior court's order granting motions for partial summary judgment in favor of the GPA and the DAS on liability and the measure of damages, and denying CTS's motion for partial summary judgment on the measure of damages.

Id. In the 2009 appeal, this court held that the trial court "applied only state law to the maritime contract at issue without consideration of federal maritime law," and remanded the case with direction for the trial court to consider the application of both federal and state law. Id. at 64.

On remand, the trial court found that "the issue[s] presented are inherently local and are to be resolved pursuant to Georgia law." The court also reaffirmed its earlier ruling granting GPA's motion for partial summary judgment on the issue of liability

_____

[2]The evidence showed that the crane tipped over because it was lifting a load that was in excess of its published load capacity.

2

on the ground that the crane operator was CTS's borrowed servant under the Tariff and that CTS was responsible for the operation of the crane under the Tariff. The court also affirmed its earlier ruling granting the GPA's motion for summary judgment on the measure of damages. CTS now appeals, enumerating several claims of error. For the following reasons, we affirm in part and reverse in part.

1. CTS contends that federal maritime law governs the enforceability of the Tariff because a terminal's practices and tariffs affect not only local interests, but also interstate and international interests.[3] The trial court found that the Tariff was inherently local because the GPA operates ports for the benefit of Georgia citizens and there is "no federal master tariff governing all U. S. ports."

"Under the 'saving to suitors' clause codified at 28 USC § 1333 (1), state courts have concurrent jurisdiction with the admiralty jurisdiction of federal courts to entertain in personam claims based on maritime causes of action." (Citations omitted.) Id. at 62-63, citing in part, *Norfolk Southern R. Co. v. Kirby*, 543 U. S. 14,

---

[3] The terminal Tariff was promulgated by the GPA under regulations of the Federal Maritime Commission at 46 CFR Part 525. A stevedoring firm such as CTS consents to the terms of the Tariff by simply using the GPA's ocean terminal located in Savannah. The GPA is subject to The Shipping Act of 1984 (46 USC § 40101 et seq.) as amended by the Ocean Shipping Reform Act of 1998, Pub. L. No. 105-258, 112 Stat. 1902 (1998) ("the Act"). See *CTS I*, supra, 301 Ga. App. at 62 n2.

22-25 (II) (125 SC 385, 160 LE2d 283) (2004). While Georgia courts have concurrent jurisdiction over this cause of action, "the extent to which state law may be used to remedy maritime injuries is constrained by a so-called 'reverse-*Erie*' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards. (Citations omitted.) *Offshore Logistics v. Tallentire*, 477 U. S. 207, 223 (IV) (106 SC 2485, 91 LE2d 174) (1986). In *CTS I*, supra, we held that "[t]he present in personam claim against CTS for money damages is a maritime cause of action because it is based on a contract directly related to a maritime service or transaction - the lease of a crane to a stevedoring company to discharge cargo from a ship berthed at the GPA's Ocean Terminal." Id. at 63.

After establishing that the contract here is maritime in nature, the second step is for the court to determine whether the case is inherently local. See *Norfolk Southern R. Co.*, supra, 543 U. S. at 27 (II). "For not every term in every maritime contract can only be controlled by some federally defined admiralty rule. A maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law." (Citations and punctuation omitted.) Id.; see *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U. S. 310, 314 (75 SC 368, 99 LE2d 337) (1955).

4

The state law involved here is the law of contracts and doctrine of borrowed servant under OCGA § 44-12-62 (b). The GPA alleges that CTS breached the Tariff when the crane it leased to CTS tipped over and was destroyed. The GPA claimed that the crane operator was the borrowed servant of CTS and that because CTS was responsible for the operation of the crane, it was liable for its replacement under the Tariff. CTS counters that the crane operator was the employee of the GPA. In order to sustain a case for breach of contract, the GPA must prove "(1) the terms of a maritime contract; (2) that the contract was breached; and (3) the reasonable value of the purported damages." (Citation omitted.) *Cornish v. Renaissance Hotel Operating Co.*, 2007 U.S. Dist. LEXIS 95115, *26 (M.D. Fla. 2007).

The state interest here concerns the right of a state agency to seek recovery for the destruction of its land-based property used exclusively at a state port. Certainly there is a strong state interest in resolving a contract dispute between a Georgia administrative agency and a Georgia corporation that involves the loss of equipment located in Georgia, specifically equipment used to load or unload cargo at a Geogia port. The interpretation of this provision of the Tariff is therefore inherently local. See *Brewer Environmental Indus. v. Maston Terminals*, 2011 U. S. Dist. LEXIS 46429, *9-12 (I) (D. Hawaii 2011) (while contract was a maritime one, no federal preemption

5

where dispute - concerning the sale of stevedoring business and a worker's compensation policy - was inherently local). The trial court therefore did not err in concluding that the breach of contract action should be resolved pursuant to Georgia law.

2. CTS argues that the trial court erred in applying state law because any state law is preempted by federal law.

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

(Citations and punctuation omitted.) *Gade v. Nat. Solid Wastes Mgmt. Assoc.*, 505 U. S. 88, 98 (II) (112 SC 2374, 120 LE2d 73) (1992); see *English v. General Elec. Co.*, 496 U. S. 72, 78-79 (II) (A) (110 SC 2270, 110 LE2d 65) (1990). CTS argues that any

6

state law is preempted by the Ocean Shipping Reform Act (46 USC § 40101 et seq.) ("the Act").

While the Act contains no explicit pre-emptive language, CTS asserts that the following provisions establish both field and conflict preemption: 46 USC § 41102 (c) ("A common carrier, marine terminal operator, or ocean transportation intermediary may not fail to establish, observe, and enforce just and reasonable regulations and practices relating to or connected with receiving, handling, storing, or delivering property"), 46 USC § 40501 (g) (3) ("The Commission shall by regulation prescribe the form and manner in which marine terminal operator schedules authorized by this section shall be published"), and 46 CFR 525.2 (a) (1) ("Any limitations of liability for cargo loss or damage pertaining to receiving, delivering, handling, or storing property at the marine terminal contained in a terminal schedule must be consistent with domestic law and international conventions and agreements adopted by the United States; such terminal schedules cannot contain provisions that exculpate or relieve marine terminal operators from liability for their own negligence . . . .")

But here, there is neither field nor conflict preemption. Nothing in these provisions of the Act or the Code of Federal Regulations governing ocean shipping

is so pervasive as to make an inference that Congress left no room for the States to supplement it with state contract law and the borrowed servant doctrine. Nor does state law stand as an obstacle here to the execution of the purposes of Congress to enforce reasonable regulations and to prohibit terminal operators from relieving themselves of liability for loss or damage to cargo due to their own negligence. CTS points to no other provision of the Act that explicitly or implicitly prohibits the GPA from assigning the risk of loss of leased equipment to the lessee. We therefore hold that the Act does not preempt the state breach of contract action here that is based in part on Georgia's borrowed servant doctrine. See *English*, supra, 496 U. S. at 80-83 (II) (B) (allegation of outrageous conduct at the hands of employer at the nuclear site not preempted by federal law on nuclear safety); compare *Jones v. Compagnie Gen. Maritime*, 882 FSupp. 1079, 1082-1083 (III) (A) (S.D. Ga. 1995) (state law preempted when federal act regulates liability of carriers on claims in both tort and contract).

3. CTS claims that the trial court erred in granting the GPA's motion for partial summary judgment on the issue of liability. On appeal from the grant of summary judgment, we apply a de novo standard of review. *Matjoulis v. Integon Gen. Ins.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997). "[T]he moving party must demonstrate that

8

there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); see also OCGA § 9-11-56 (c).

(a) CTS contends that the crane operator was not its borrowed servant but was rather the employee of the GPA. The trial court ruled that the crane operator was a borrowed servant under the Tariff, and that because the operator did not operate the crane within its capacity and the Tariff provided that CTS as lessee was responsible for the operation of the crane and assumed all risk of damages out of such operation, CTS was liable to the GPA for the loss of the crane.

The relevant portions of the Tariff are as follows:

Rule 34-550 . . .

LEASING OF CRANES, CONTAINER-HANDLERS, OR CARGO HANDLING EQUIPMENT

. . . In the case of the container and gantry cranes, or the container-handlers, such equipment will be leased only in support of vessel operations. *The lease rates cover the equipment being leased, a qualified operator*, and in the case of the cranes, a mechanic, when and as needed.

The operator provided with any leased equipment shall follow the instructions and signals from the lessee. The operator shall provide information to the lessee when requested, but in no way shall such information be considered as instructions or orders.

*The lessee agrees to operate the equipment within its rated capacity*, which shall be provided by Terminal Management, prior to the use of said equipment. Also, lessee agrees to be bound by the terms and conditions set forth in rule 34-600, entitled "Lessee Responsibility."

. . .

Rule 34-600 . . .

LESSEE RESPONSIBILITY

When cranes, hoists, . . . and other equipment . . . which are used in the moving or lifting of cargoes (hereinafter called "Leased Equipment") are leased to others, it is expressly understood that such Leased Equipment will be operated under the direction and control of the Lessee, and the Lessee shall be responsible for the operation thereof and assume all risks for injuries or damages which may arise from or grow out of the use or operation of said Leased Equipment.

Lessee, by acceptance of such Leased Equipment, agrees to fully protect, indemnify, reimburse, and save harmless the [GPA] and its employees against any and all causes of action, suits, claims, damages, and

demands, of whatever kind or nature, including claims for consequential property damage, natural resource damage . . . that are incident to or result from the lessee's operations on the property of the [GPA] and the use of the [GPA's] facilities (hereinafter "damages") and shall defend the [GPA] from any legal or equitable action brought against the [GPA] based on said damages . . . *Should said Leased Equipment be damaged or destroyed while so leased (except when caused by natural perils such as windstorm, flood, fire, or earthquake, or by structural failure not resulting from operation of said equipment beyond its rated capacity), Lessee shall pay for all necessary repairs to or replacement of said equipment, but shall not be responsible for damages resulting from loss of use.*

This rule is not to be construed as requiring any Lessee to indemnify or hold harmless the [GPA] for that portion or percentage of such losses, if any, caused by the negligence of the [GPA].

It is incumbent upon the Lessee to make a thorough inspection and to satisfy himself as to the physical condition and capacity of the Leased Equipment, as well as the competency of operator (including any operator supplied by the Lessor with said equipment), there being no representations or warranties with reference to such matter.

(Emphasis supplied.)

The Tariff provided that leased equipment "will be operated under the direction and control of the Lessee," and that the lessee is responsible for the operation of the

crane and assumes the risks for damages that arise from the use of it. CTS argues that because the crane was operated by the GPA's employee, who did not actually operate under CTS's complete direction and control, it could therefore not be liable for the destruction of the crane. The GPA counters that the crane operator was CTS's borrowed servant and because CTS was contractually responsible for the conduct of the operator during the crane's operation, CTS is liable for its replacement.

"The borrowed servant doctrine in Georgia, particularly in conjunction with the hiring of equipment or other personal property, is rooted in statutory law." *Tim's Crane & Rigging v. Gibson*, 278 Ga. 796, 797 (604 SE2d 763) (2004). The doctrine provides that "[i]f the bailor sends his own agents with the thing bailed, the hirer shall not be liable for the acts of such agents but shall only be liable either to the bailor or to third persons for the consequences of his own directions and for gross neglect." OCGA § 44-12-62 (b). "The reference to the hirer's 'own directions' in OCGA § 44-12-62 (b) refers to the borrowed servant doctrine." *Tim's Crane*, supra.

> The requirements for the borrowed servant doctrine to apply are well settled in this state: In order for an employee to be a borrowed employee, the evidence must show that "(1) the special master had complete control and direction of the servant for the occasion; (2) the general master had no such control, and (3) the special master had the exclusive right to discharge the servant.

12

(Citation and punctuation omitted.) Id.

In this case, neither the contract nor the other evidence before the trial court establishes that the crane operator was CTS's borrowed servant as a matter of law. The GPA relies solely on the following terms of the Tariff to establish that CTS contractually agreed that the crane operator was its borrowed servant: "[t]he lease rates cover the equipment being leased, [and] a qualified operator," and "[t]he operator provided with any leased equipment shall follow the instructions and signals from the [CTS]." But this language fails to show that CTS had complete control and direction of the crane operator, that the GPA had no such control, and that CTS had the exclusive right to discharge the operator. Compare id. at 798 (contract between lessor and lessee explicitly set forth each requirement of borrowed servant doctrine); *Odum v. Superior Rigging and Erecting Co.*, 291 Ga. App. 746, 749 (662 SE2d 832) (2008).[4]

---

[4]We note that CTS presented evidence that crane operators are paid by the GPA, that the GPA makes the final decision to fire or remove operators from a job, that if a stevedore (which directs operators to the ship's hatch ) is dissatisfied with an operator, it must notify the GPA and request a replacement, that the GPA makes the "ultimate decision" whether to remove an operator, and that operators had daily meetings with GPA supervisors and communicated with them by radio throughout the day.

13

"In cases where each requirement of the borrowed servant doctrine is not explicitly set forth in an express contract, however, such as the instant case, the relationship between the hirer and the bailor's employee is generally a question of fact to be decided by a jury." (Citation omitted.) *Coe v. Carroll & Carroll*, 308 Ga. App. 777, 781 (1) (709 SE2d 324) (2011). Because the contract here did not establish that the crane operator was a borrowed servant as a matter of law, the trial court erred

in granting summary judgment to the GPA on the issue of liability.[5] See id. at 781-

---

[5]The GPA contends that CTS is estopped from claiming that the crane operator was not its employee because of an admission in judicio, "admissions upon which other parties have acted," and "evidence of a record unreversed" that the crane operator was its employee. See OCGA § 24-4-24 (b) (1), (7) and (8); *Reagan v. Lynch*, 241 Ga. App. 642, 643-644 (524 SE2d 510) (1999) (outlining elements of judicial estoppel doctrine). The GPA's argument here is based upon a "[c]ompensation [o]rder" pursuant to the Longshore and Harbor Workers' Compensation Act, 33 USC § 901 et seq., in which the crane operator's compensation claim was settled. This order states:

> Pursuant to agreement and stipulation by and between the interested parties and such further investigation in the above entitled claim having been made as is considered necessary, and no hearing having been applied for by any party in interest, or considered necessary by the District Director, the District Director makes the following:
>
> FINDINGS OF FACT
>
> 1. On July 15, 2000, the claimant herein, while employed by the employer herein, sustained injury when a crane collapsed and caused his death.
>
> 2. The liability of the employer for compensation under the Longshore and Harbor Workers' Compensation Act was insured by American Longshore Mutual Associates.
>
> 3. The parties have agreed on the pertinent issues and desire to settle the claim on the following bases: A lump sum payment of $5,000 to Sarah H. Messex.

15

782 (1).

(b) CTS argues that summary judgment was improper in any case because the GPA's negligence contributed to the crane's collapse. But because we have held that the trial court erred in granting summary judgment to the GPA on the issue of liability, we need not address this claim.

4. While we reverse the grant of summary judgment to the GPA on CTS's liability in Division 3 (a), we nevertheless address the grant of summary judgment to the GPA on the measure of damages. CTS argues that the proper measure of damages is the fair market value of "a 1963 Diamond Gantry Crane on July 15, 2000," and that

---

The "agreement and stipulation by and between the interested parties" is not attached to the order, is not a part of the record before us, and its contents are not summarized or explained in the order. While the District Director made a finding that "the claimant herein, while employed by the employer herein, sustained injury," it is not clear whether this finding was a result of "agreement and stipulation" or "further investigation" by the District Director. See *Keenan v. Director for the Benefits Review Bd.*, 392 F3d 1041, 1043 (III) (9th Cir.) (2004) (Longshore and Harbor Workers' Compensation Act construed broadly and liberally in light of purpose of compensating disabled workers). Three other documents relied on by the GPA and signed by CTS's attorney, including a party designation in a notice of appearance, a notice of representation, and an "In Re" line of a cover letter cannot be construed as an admission that the crane operator was its employee, neither can a fourth document signed by a claims examiner. The GPA has therefore failed to prove it is entitled to estoppel under any of the theories asserted.

under the terms of the Tariff, "replacement" means "to return GPA to the place it was in immediately before the crane was damaged or destroyed."

"The first rule that courts must apply when construing contracts is to look to the plain meaning of the words of the contract, . . . Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning." (Citation, punctuation and footnote omitted.) Id. Webster's Unabridged Dictionary (2nd Edition) defines "replace" as "to put again in or restore to a former place," "to put back or pay back," or "to fill the place of with a substitute." And Black's Law Dictionary (7th ed. 2000) defines "replacement cost" as "[t]he cost of acquiring an asset that is as equally useful or productive as an asset currently held." Therefore, contrary to CTS's argument here, the term "replacement" in the Tariff means a substitute crane for the one destroyed, not the fair market value of the crane at the time it was destroyed. The trial court did not err in granting the GPA's motion for summary judgment on the measure of damages.

5. Relying solely upon *Georgia Ports Auth. v. Hutchinson*, 209 Ga. App. 726 (434 SE2d 791) (1993), CTS argues that the Tariff's exculpatory provisions here are contrary to public policy. In *Hutchinson*, a crane operator controlled by the Georgia

17

Ports Authority dropped a container box on the plaintiff's hand, injuring him. Id. This court excluded evidence of a tariff which the Ports Authority contended would have proved it did not control the crane and the crane operator, and held that the tariff's disclaimer was contrary to public policy. Id. at 729 (6). But *Hutchinson* is silent as to the particular language of the disclaimer in the tariff, and in any case, the Tariff here contains a limitation on the GPA's disclaimer of liability for its own negligence. Compare, e. g., *Country Club Apartments v. Scott*, 246 Ga. 443, 444 (271 SE2d 841) (1980) (exculpatory provision for contracting parties' *sole* negligence void as against public policy). This claim of error is therefore without merit.

*Judgment affirmed in part and reversed in part. Doyle, P. J. and Andrews, J., concur.*